**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| ERIKA ALEJANDRA MEJIA SANCHEZ, an individual, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEXANDRA LOZANO KENNEDY, an individual, et al.,<br><br>Defendants. | **NO. 2:26-cv-01587-RSM**<br><br>**DECLARATION OF MATTHEW N. METZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PREJUDGMENT WRIT OF ATTACHMENT**<br><br>**NOTING DATE: October 29, 2026** |

I, Matthew N. Metz, declare as follows:

1. I am an attorney licensed in Washington and one of the attorneys of record for Plaintiffs. I am over eighteen, competent to testify, and make this declaration from personal knowledge and from my review of the public records, listings, and client files identified below. Each exhibit that is a public record was obtained by me or under my direction from the source and on the date stated.



Metz Law Group, PLLC
101 Yesler Way, Suite 600
Seattle, WA 98104
Tel: 206-583-2745

2. **Statutory averments (RCW 6.25.060(1)).** The attachment sought by this application is not sought, and this action is not prosecuted, to hinder, delay, or defraud any creditor of any Defendant. I have reason to believe and do believe, for the specific reasons stated in this declaration and in the Declarations of Gerardo Prado Rivera, Aurora Lizzette Leal Rubio, Angélica Maria Barajas Horta, and Ana Maria Garcia Martinez, that Defendants Alexandra Lozano Kennedy and La Luz del Camino Legal, PLLC are indebted to Plaintiffs in the amount of not less than $620,874 over and above all just credits and offsets, and that grounds for attachment exist under RCW 6.25.030(2), (6), (7), (8), and (9). Plaintiffs seek to attach real estate only.

3. **Nature and amount of the indebtedness.** The indebtedness consists of fees and charges Plaintiffs paid the Firm under written fee agreements, together with documented amounts paid to substitute counsel. Attached as Exhibit 1 is a table, prepared under my direction from the Second Amended Complaint, the four supporting declarations, and the fee agreements, invoices, receipts, and substitute-counsel invoices in Plaintiffs' counsel's possession, stating the amount for each Plaintiff. For the four declarants, the amounts are those itemized in their declarations. The total is $620,874, consisting of $555,674 in fees and charges and $65,200 in documented payments to substitute counsel and related USCIS fees. No Defendant has refunded any portion, and I know of no credit or offset owed to any Defendant. Judgment on the RICO claim will be three times actual damages under 18 U.S.C. § 1964(c); the amount in paragraph 2 is actual damages only.

4. **Bar proceedings.** Attached as Exhibit 2 are true and correct copies of the August 3, 2026 Order Appointing Custodians and the August 18, 2026 Amended Order Appointing Custodians entered by the Chair of the Washington State Bar Association Disciplinary Board



Metz Law Group, PLLC
101 Yesler Way, Suite 600
Seattle, WA 98104
Tel: 206-583-2745

in Proceeding No. 26#00039, together with the Resignation Form of Alexandra Lozano (ELC 9.3(b)) in Proceeding No. 25#00062, signed by Ms. Lozano on May 26, 2026 and endorsed by Disciplinary Counsel, and its Exhibit A, Disciplinary Counsel's Statement of Alleged Misconduct under ELC 9.3(b)(1) dated May 26, 2026, and obtained from the Bar's website.

5. **Covington Property: acquisition.** Attached as Exhibit 3 is a true and correct copy of the statutory warranty deed recorded July 21, 2023, King County Recording No. 20230721000355, by which Peter and Heather Hattrup conveyed 20511 SE 261st Place, Covington (Tax Parcel No. 259178-0120), to "Alexandra Lozano and Magaly Lozano-Perea, unmarried persons," for a stated selling price of $735,000. Attached as Exhibit 4 is a true and correct copy of the deed of trust recorded the same day, No. 20230721000356, securing a $588,000 note to U.S. Bank National Association.

6. **Marital status.** Attached as Exhibit 5 are true and correct copies of the statutory warranty deed dated November 14, 2023 and recorded November 20, 2023, No. 20231120000819, by which "Alexandra Lozano and Manuel Lozano Rodriguez, a married couple" conveyed King County Tax Parcel No. 122205-9016 to Ahmad Rabi for a stated selling price of $2,000,000, and the deed of reconveyance recorded December 11, 2023, No. 20231211000788, releasing the $1,024,000 deed of trust on that parcel.

7. **Covington Property: payoff and title.** Attached as Exhibit 6 is a true and correct copy of the deed of reconveyance recorded March 15, 2024, No. 20240315000675, reciting that the obligation secured by the $588,000 deed of trust was fully satisfied. Attached as Exhibit 14 is a true and correct copy of the King County Recorder's parcel search for Tax Parcel No. 259178-0120, run on September 25, 2026, which shows no deed of trust or other



Metz Law Group, PLLC
101 Yesler Way, Suite 600
Seattle, WA 98104
Tel: 206-583-2745

lien recorded after July 21, 2023 other than Plaintiffs' lis pendens (No. 20260723000029), and no declaration of homestead or of nonabandonment.

8. **Condominium.** Attached as Exhibit 7 is a true and correct copy of the statutory warranty deed recorded June 8, 2023, No. 20230608000102, conveying Unit 3504, The Emerald, 121 Stewart Street, Seattle (Tax Parcel No. 232971-2510), to "Alexandra Lozano, as trustee of the Five Star Legacy Trust, dated April 25, 2023," for a stated selling price of $3,200,000. Attached as Exhibit 8 is a true and correct copy of the deed of reconveyance recorded January 29, 2024, No. 20240129000295, reciting that the $2,400,000 deed of trust recorded June 8, 2023 (No. 20230608000103) was fully satisfied. Attached as Exhibit 9 is a true and correct copy of the deed of trust recorded April 30, 2025, No. 20250430000835, securing a note dated March 25, 2025 for $2,380,000 to U.S. Bank National Association, signed by Ms. Lozano as trustee, which attaches an Inter Vivos Revocable Trust Rider identifying Alexandra Lozano as the sole trustee and sole settlor of the Trust and warranting that only the settlor and trustee may hold any power of direction over it. Attached as Exhibit 10 is a true and correct copy of the re-recording of that deed of trust on July 29, 2025, No. 20250729000964, which states on its face that it "is being re recorded to add the Arm Rider"; it creates no additional lien. Attached as Exhibit 19 is a true and correct copy of the King County Recorder's parcel search for Tax Parcel No. 232971-2510, run on September 25, 2026, which shows no other lien of record on the Condominium.

9. **Residence.** Attached as Exhibit 13 is a true and correct copy of the Florida Department of State, Division of Elections, Voter Information Lookup record for Alexandra Lozano, printed on September 25, 2026. It shows that she registered to vote in Marion County, Florida on October 15, 2025, listing her residence as 1415 SE 38th Avenue, Ocala,



Metz Law Group, PLLC
101 Yesler Way, Suite 600
Seattle, WA 98104
Tel: 206-583-2745

Florida 34471, and that her registration is active. According to the Marion County Property Appraiser, that property is owned of record by a person other than Ms. Lozano. On September 29, 2026, I searched Washington voter registration records and found no active Washington voter registration for Ms. Lozano.

10. **Property taxes.** Attached as Exhibits 11 and 12 are true and correct copies of the King County Treasurer’s tax account records for the Condominium and the Covington Property, printed September 25, 2026. The Condominium’s taxpayer mailing address is 500 Elliott West #404, Seattle; its last payment was received April 9, 2025; the second half of 2025 and the first half of 2026 are delinquent, with a combined balance of $31,975.37. The Covington Property’s mailing address is the property itself; $3,759.02 for 2025 and $4,127.04 for the first half of 2026 are delinquent.

11. **Valuation.** Attached as Exhibits 15 and 18 are true and correct copies of the King County Assessor’s property detail reports for the Covington Property and the Condominium, printed September 25, 2026, showing 2026 appraised values of $725,000 and $1,819,000.

12. **Listings.** Attached as Exhibit 16 is a true and correct copy of the Northwest MLS listing history and current listing for the Covington Property (MLS 2527848), showing that it was listed on June 5, 2026 at $852,500, returned to active status on August 10, 2026, and is described as vacant, with a “Motivated Seller” whose seller “just vacated.” Attached as Exhibit 17 is a true and correct copy of the Northwest MLS listing history for the Condominium, showing a listing at $3,440,000 cancelled on October 16, 2024 (MLS 2291178), and the current listing entered April 10, 2026 at $2,700,000 and now at $2,600,000 (MLS 2502738).



Metz Law Group, PLLC
101 Yesler Way, Suite 600
Seattle, WA 98104
Tel: 206-583-2745

13. **Insurance.** Defendants' Rule 26(a)(1) initial disclosures, served July 21, 2026, identify their insurance by reference to Attachment 1, the declarations page of Golden Bear Insurance Company Lawyers Professional Liability Policy No. GAL03000770-02, issued to Alexandra Lozano Immigration Law, PLLC for the policy period October 26, 2025 to October 26, 2026. The declarations page states a limit of $1,000,000 for each claim and $2,000,000 in the aggregate for all claims, and a $100,000 deductible. It states that the policy provides coverage on a claims made and reported basis and that payments made by the insurer for Loss and Claims Expenses reduce the Limit of Liability. Attached as Exhibit 21 are true and correct copies of those disclosures and of Attachment 1.

14. **Lis pendens.** Attached as Exhibit 20 are true and correct copies of Plaintiffs' notices of lis pendens recorded July 23, 2026, King County Recording Nos. 20260723000028 (Condominium) and 20260723000029 (Covington Property).

15. **Notice.** Plaintiffs will serve notice of this application on Ms. Lozano and Ms. Lozano Perea in the same manner as a summons, together with a copy of this declaration and copies of RCW 6.13.010, 6.13.030, and 6.13.040, as RCW 6.25.070(4) requires.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of October, 2026, at Seattle, Washington.

/s/ Matthew N. Metz
Matthew N. Metz, WSBA #25050



Metz Law Group, PLLC
101 Yesler Way, Suite 600
Seattle, WA 98104
Tel: 206-583-2745

# EXHIBIT 1

**EXHIBIT 1**
**Amounts Paid to the Lozano Firm and Paid to Substitute Counsel**

| **A. Fees and charges paid to the Firm** | **Source** | **Amount** |
|---|---|---|
| Mejia Sanchez & Villanueva Vega | SAC ¶ 4.54 | $32,355 |
| Lopez Contreras | SAC ¶ 4.67 | $17,500 |
| Murillo Moreno | SAC ¶ 4.85 | $15,000 |
| A. Barajas Horta | Horta Decl. ¶ 7 | $13,675 |
| Garcia Martinez | Garcia Martinez Decl. ¶ 9 | $16,400 |
| Martinez Garcia | SAC ¶ 4.129 | $15,000 |
| Prado Rivera | Prado Decl. ¶ 9 | $15,890 |
| Leal Rubio | Leal Rubio Decl. ¶ 9 | $14,960 |
| Villalon Rivera | SAC ¶ 4.171 | $12,850 |
| Navarro Ceja & Fernandez Rayas | SAC ¶ 4.187 | $47,500 |
| Coto Roman | SAC ¶ 4.220 | $24,210 |
| Marin Sosa | SAC ¶ 4.240 | $18,225 |
| Galvan Rodriguez | SAC ¶ 4.255 | $15,000 |
| Flores Campos & Muratalla Magana | SAC ¶ 4.270 | $34,850 |
| Galindo Velasquez | SAC ¶ 4.281 | $13,855 |
| Gallardo Martinez & Erendira Nava | SAC ¶ 4.293 | $40,075 |
| Garcia Vidaca | SAC ¶ 4.309 | $17,435 |
| Ortiz Osorio | SAC ¶ 4.326 | $7,950 |
| Mendoza Jimenez | SAC ¶ 4.345 | $15,300 |
| Solis Romero | SAC ¶ 4.361 | $13,000 |
| Vasquez Rocete | SAC ¶ 4.376 | $13,610 |
| Gonzalez Garibay | SAC ¶ 4.385 | $25,925 |
| Chavez Gomez | SAC ¶ 4.400 | $20,000 |
| D. Barajas Horta | SAC ¶ 4.411 | $16,560 |
| Guzman Vidals | SAC ¶ 4.423 | $13,825 |
| Reynoso Jaimes | SAC ¶ 4.434 | $16,424 |
| Rangel Salinas | SAC ¶ 4.450 | $13,000 |
| Prieto Muniz & Medina Juarez | SAC ¶ 4.461 | $20,300 |
| Sosa Rodriguez | SAC ¶ 4.477 | $15,000 |
| **Total** | | **$555,674** |

| **B. Substitute counsel and related USCIS fees** | **Source** | **Amount** |
|---|---|---|
| Fernandez Rayas | SAC ¶ 4.195 | $8,000 |
| Navarro Ceja | SAC ¶ 4.205 | $7,000 |
| Marin Sosa (incl. $1,700 USCIS fees) | SAC ¶ 4.252 | $12,700 |
| Flores Campos & Muratalla Magana | SAC ¶ 4.276 | $15,500 |
| Gallardo Martinez & Erendira Nava | SAC ¶ 4.304 | $12,000 |

| | | |
|---|---|---|
| Vasquez Rocete | SAC ¶ 4.382 | $5,000 |
| Rangel Salinas | SAC ¶ 4.457 | $5,000 |
| **Total** | | **$65,200** |

**Total actual damages (A + B): $620,874**

For the four declarants, amounts are the fees and costs itemized in their declarations filed with this motion. For all other Plaintiffs, amounts are as pleaded in the Second Amended Complaint (Dkt. 40); figures pleaded as "approximately" or "at least" are stated at the pleaded amount. Demanded but unpaid sums, lost wages, and emotional distress are excluded.

# EXHIBIT 2

FILED

Aug 3, 2026

Disciplinary Board

Docket # 010

DISCIPLINARY BOARD
WASHINGTON STATE BAR ASSOCIATION

| | |
|---|---|
| In re<br><br>Alexandra Lozano,<br><br>Lawyer (resigned in lieu of discipline)<br>WSBA #40478 | Proceeding No. 26#00039<br><br>ORDER APPOINTING CUSTODIANS TO PROTECT CLIENTS' INTERESTS |

On July 22, 2026, the Washington State Bar Association ("WSBA") General Counsel filed a Motion seeking the appointment of custodians to protect the interests of the former clients of Alexandra Lozano (WSBA #40478). Following the Disciplinary Board Chair's order dated July 27, 2026, Ms. Lozano filed a timely Response, and the General Counsel filed a timely Reply.

After consideration of the Motion, Response, Reply, and supporting materials, the Chair finds that Ms. Lozano resigned from WSBA in lieu of discipline, did not fulfill her Title 14 responsibilities and has failed to protect client interests, and that it appears no personal representative, partner, or other responsible person is properly protecting the clients' interests. Particularly persuasive is the General Counsel's evidence of confusion or concern by hundreds of Ms. Lozano's former clients, as well descriptions in Ms. Lozano's own submissions of the challenges of winding down her practice and addressing her former

clients' needs. This justifies the appointment under ELC Rule 7.7(a) of custodians to act as counsel for the purposes of protecting clients' interests.

The General Counsel submitted a proposed order governing the appointment of custodians. Ms. Lozano's Response raised several concerns regarding elements of the proposed order and submitted a proposed order of her own. The General Counsel submitted a revised proposed order addressing the issues raised in the Response, incorporating most, but not all, of the changes proposed by Ms. Lozano.

The Chair declines to include Ms. Lozano's suggested language requiring coordination with her and her former law firm. The paramount consideration is protection of the clients' interests. While some coordination will likely be necessary for custodians to carry out their responsibilities and Ms. Lozano to satisfy her ongoing obligations to former clients, mandatory coordination as Ms. Lozano proposes could slow or otherwise hinder the custodians' efforts to protect clients' interests. Though the attorney work product doctrine may be asserted by either a client or a lawyer, their respective interests in restricting opposing parties' access to work product would ordinarily align. Ms. Lozano's former clients and any new counsel they obtain could be expected to protect those interests. Ms. Lozano has not demonstrated a legitimate need for her interests in attorney work product to be protected separately from the interests of her former clients.

**NOW, THEREFORE,** pursuant to ELC 7.7(a), **IT IS HEREBY ORDERED:**

CUSTODIAN: Lawyers Adam Boyd (WSBA #49849) and Russell Aoki (WSBA #15717) are appointed Custodians of the client files and records and trust account(s) for former lawyer Alexandra Lozano. Upon motion, additional custodians may be appointed to this matter.

DUTIES: The Custodians are granted the authority to take necessary action to obtain possession of client-specific records, documents, and other case-related client information in physical or electronic format created and maintained by Ms. Lozano and/or her former firm(s) in furtherance of the representation of identifiable clients, and to act as needed to

protect client interests or as directed by the Chair's order or the ELCs. Those actions include assuming control of trust accounts.[1] The Custodians shall be granted access to client-related financial and billing records reasonably necessary to determine ownership of trust account funds to protect clients' interests. Further, the custodians shall be granted access to client billing records so that clients' interests can be protected should they want to apply to the Client Protection Fund, where they must demonstrate whether work of value was performed.

Any bank or other person honoring the authority of the Custodians is exonerated from any resulting liability. ELC 7.7(b).

The Custodians may also take possession of all mail routed to Alexandra Lozano Immigration Law or La Luz Del Camino Legal. By facilitating compliance with this Order, neither Ms. Lozano nor her former firm shall be deemed to waive any arguments or objections they may have in connection with their independent interest in any attorney work product that may be present in the client materials obtained by the Custodians.

Absent further order of the Chair, the Custodians are not authorized to obtain possession of records, documents, information, and/or communications that are not related to representation of clients of Ms. Lozano or that relate to internal operations of her former firm, administrative matters, human resource matters, non-client related communications between Ms. Lozano or her former firm and their outside counsel, or accounts other than the firm's trust account.

IMMUNITY: The Custodians and other lawyers and staff working under the direct supervision of the custodian shall enjoy quasi-judicial immunity as set forth in General Rule 12.5.

PUBLIC INFORMATION: The fact that Custodians have been appointed, the Custodians' names and contact information, and this order are public information. Client

[1] The Chair notes that ELC Rule 7.7(b) authorizes a custodian to assume control of not only trust accounts, but also "other financial affairs." This order adopts the scope of financial authority proposed by the General Counsel; control over "other financial affairs" may be sought by motion if necessary to carry out the purposes of ELC Rule 7.7.

files and records held by the Custodians are confidential unless release is authorized by the client. ELC 3.3(c).

DESTRUCTION: Ms. Lozano represents that she and her former law firm are currently named defendants in two lawsuits in federal court in the Western District of Washington brought by former clients in connection with which Ms. Lozano and her former firm have document preservation obligations which require that they retain copies of the client files and related materials here at issue. Accordingly, the Custodians shall not destroy any files or records. Upon completion of the custodianship and resolution of any litigation requiring preservation, Ms. Lozano remains responsible for appropriately destroying or otherwise disposing of client records in accordance with applicable law and ethical obligations.

This Order may be filed in any court or administrative agency proceeding, or presented to any person, financial institution, or other entity.

DATED this 3rd day of August, 2026.

Keith E. Cohon
Disciplinary Board Chair



Washington State Bar Association
1325 Fourth Ave, Suite 600
Seattle, WA 98101

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the Order Appointing Custodians to Protect Clients' Interests to be emailed to the Office of General Counsel and to the Respondent's Counsel, Kevin M Bank, at kevin@kevinbanklaw.com, Respondent's Counsel, Angelo Calfo, at angelo@angelicalfo.com, Respondent's Counsel Harold Malkin, at harold@angelicalfo.com, Respondent's counsel Tyler Weaver, at tylerw@angelicalfo.com, on the 3rd day of August, 2026.

______________________________________
Clerk to the Disciplinary Board

FILED

Aug 18, 2026

Disciplinary Board

Docket # 014

DISCIPLINARY BOARD
WASHINGTON STATE BAR ASSOCIATION

| | |
|---|---|
| In re<br><br>Alexandra Lozano,<br><br>Lawyer (resigned in lieu of discipline)<br>WSBA #40478 | Proceeding No. 26#00039<br><br>AMENDED ORDER APPOINTING CUSTODIANS TO PROTECT CLIENTS' INTERESTS |

After reviewing the Stipulated Motion to Amend Order Appointing Custodians' to Protect Clients' Interests, the Chair of the Disciplinary Board amends the August 3, 2026, Order Appointing Custodians' to Protect Clients' Interests. It is **HEREBY ORDERED:**

On July 22, 2026, the Washington State Bar Association ("WSBA") General Counsel filed a Motion seeking the appointment of custodians to protect the interests of the former clients of Alexandra Lozano (WSBA #40478). Following the Disciplinary Board Chair's order dated July 27, 2026, Ms. Lozano filed a timely Response, and the General Counsel filed a timely Reply.

After consideration of the Motion, Response, Reply, and supporting materials, the Chair finds that Ms. Lozano resigned from WSBA in lieu of discipline, did not fulfill her Title 14 responsibilities and has failed to protect client interests, and that it appears no personal representative, partner, or other responsible person is properly protecting the clients' interests. Particularly persuasive is the General Counsel's evidence of confusion or



Washington State Bar Association
1325 Fourth Ave, Suite 600
Seattle, WA 98101

concern by hundreds of Ms. Lozano's former clients, as well descriptions in Ms. Lozano's own submissions of the challenges of winding down her practice and addressing her former clients' needs. This justifies the appointment under ELC Rule 7.7(a) of custodians to act as counsel for the purposes of protecting clients' interests.

The General Counsel submitted a proposed order governing the appointment of custodians. Ms. Lozano's Response raised several concerns regarding elements of the proposed order and submitted a proposed order of her own. The General Counsel submitted a revised proposed order addressing the issues raised in the Response, incorporating most, but not all, of the changes proposed by Ms. Lozano.

The Chair declines to include Ms. Lozano's suggested language requiring coordination with her and her former law firm. The paramount consideration is protection of the clients' interests. While some coordination will likely be necessary for custodians to carry out their responsibilities and Ms. Lozano to satisfy her ongoing obligations to former clients, mandatory coordination as Ms. Lozano proposes could slow or otherwise hinder the custodians' efforts to protect clients' interests. Though the attorney work product doctrine may be asserted by either a client or a lawyer, their respective interests in restricting opposing parties' access to work product would ordinarily align. Ms. Lozano's former clients and any new counsel they obtain could be expected to protect those interests. Ms. Lozano has not demonstrated a legitimate need for her interests in attorney work product to be protected separately from the interests of her former clients.

NOW, THEREFORE, pursuant to ELC 7.7(a), IT IS HEREBY ORDERED:

**CUSTODIAN**: Lawyers Adam Boyd (WSBA #49849) and Russell Aoki (WSBA #15717) are appointed Custodians of the client files and records and trust account(s) for former lawyer Alexandra Lozano. Upon motion, additional custodians may be appointed to this matter.

**DUTIES**: The Custodians are granted the authority to take necessary action to obtain nonexclusive access to, or possession of copies, exports, images, or other

reproductions of possession of client-specific records, documents, and other case-related client information in physical or electronic format created and maintained by Ms. Lozano and/or her former firm(s) in furtherance of the representation of identifiable clients, and to act as needed to protect client interests or as directed by the Chair's order or the ELCs. However, the Custodians shall have exclusive control of theThose actions include assuming control trust accounts.  The Custodians shall be granted access to client-related financial and billing records reasonably necessary to determine ownership of trust account funds to protect clients' interests. Further, the custodians shall be granted access to client billing records so that clients' interests can be protected should they want to apply to the Client Protection Fund, where they must demonstrate whether work of value was performed. Barring any unforeseen technological or licensing issues, access to the allowable materials described herein must be provided to the Custodians no later than ten (10) days from the date of this order.

Any bank or other person honoring the authority of the Custodians is exonerated from any resulting liability. ELC 7.7(b).

The Custodians may also take possession of all mail routed to Alexandra Lozano Immigration Law or La Luz Del Camino Legal. The Custodians' access to or possession of mail shall be nonexclusive and shall not require the transfer, destruction, disabling, or alteration of any master mailbox, mail archive, or mail system maintained by Ms. Lozano or her former firm(s), absent further order of the Chair. By facilitating compliance with this Order, neither Ms. Lozano nor her former firm shall be deemed to waive any arguments or objections they may have in connection with their independent interest in any attorney work product that may be present in the client materials obtained by the Custodians.

Absent further order of the Chair, the Custodians are not authorized to obtain possession of records, documents, information, and/or communications that are not related to representation of clients of Ms. Lozano or that relate to internal operations of her former firm, administrative matters, human resource matters, non-client related communications



Washington State Bar Association
1325 Fourth Ave, Suite 600
Seattle, WA 98101

between Ms. Lozano or her former firm and their outside counsel, or accounts other than the firm's trust account. In addition, the custodians are not authorized to obtain or review attorney-client privileged communications between Ms. Lozano or her former firm and their outside counsel, including communications that relate to Ms. Lozano's or her former firm's clients.

In the event that materials that (1) are not related to representation of clients of Ms. Lozano; (2) relate to internal operations of her former firm, administrative matters, human resource matters, or accounts other than the firm's trust account; and/or (3) constitute attorney-client privileged communications between Ms. Lozano or her former firm and their outside counsel, including communications that relate to Ms. Lozano's or her former firm's clients (collectively, "Non-Client Information") are disclosed, made available to, or provided to the Custodians, that disclosure shall not constitute a waiver of any attorney-client, work-product, or other privilege or protection, regardless of whether the producing party took reasonable steps to prevent disclosure, and regardless of whether the disclosure was inadvertent or otherwise. Upon receipt of written notice from Ms. Lozano or her former firm identifying any Non-Client Information that was inadvertently or improperly produced, the Custodians shall, within five business days of such notice:

•immediately cease any review, use, or dissemination of the identified Non-Client Information;

•promptly return, sequester, or destroy all copies of the identified Non-Client Information, including any copies, summaries, abstracts, notes, or other work product derived therefrom, in whatever form or medium; and

•certify in writing that all such materials have been returned, sequestered, or destroyed and that no copies have been retained.

This provision is intended to be enforceable under Federal Rule of Evidence 502(d) and any analogous rule or statute.

The Custodians shall undertake reasonable steps to not disclose Non-Client Information and will notify representatives of Ms. Lozano or her former firm within five business days of realizing that they have received or been granted access to Non-Client Information. If the Custodians disclosed or used any Non-Client Information prior to receiving notice of a disclosure or noticing that they had received Non-Client Information, the Custodians shall take all reasonable steps to retrieve such material and to prevent further disclosure.

**IMMUNITY**: The Custodians and other lawyers and staff working under the direct supervision of the custodian shall enjoy quasi-judicial immunity as set forth in General Rule 12.5.

**PUBLIC INFORMATION**: The fact that Custodians have been appointed, the Custodians' names and contact information, and this order are public information. Client files and records held by the Custodians are confidential unless release is authorized by the client. ELC 3.3(c).

**DESTRUCTION AND RETENTION**: Ms. Lozano represents that she and her former law firm are currently named defendants in two lawsuits in federal court in the Western District of Washington brought by former clients in connection with which Ms. Lozano and her former firm have document preservation obligations which require that they retain copies of the client files and related materials here at issue. Accordingly, the Custodians shall not destroy any files or records. Notwithstanding any other provision of this Order, Ms. Lozano and her former firm shall be entitled to maintain the master version of, and a complete copy of, all firm data, including all client files, records, documents, communications, and other case-related information in physical or electronic format, whether or not the Custodians obtain possession of such materials. Wherever reasonably practicable, the Custodians shall obtain copies, rather than original or sole versions, of client-specific records, documents, and other case-related client information. If the Custodians take possession of any original or sole version of any record or data, Ms. Lozano



Washington State Bar Association
1325 Fourth Ave, Suite 600
Seattle, WA 98101

and her former firm shall be permitted, at their own expense, to make and retain a complete copy of such record or data before or promptly following the transfer of possession. Nothing in this Order shall be construed to require Ms. Lozano or her former firm to relinquish, delete, destroy, or transfer their master versions or copies of firm data, and the retention of such materials by Ms. Lozano or her former firm shall not constitute a violation of this Order. All materials retained by Ms. Lozano or her former firm pursuant to this paragraph shall remain subject to applicable confidentiality obligations, document preservation obligations, and the Rules of Professional Conduct. Upon completion of the custodianship and resolution of any litigation requiring preservation, Ms. Lozano remains responsible for appropriately destroying or otherwise disposing of client records in accordance with applicable law and ethical obligations.

This Order may be filed in any court or administrative agency proceeding, or presented to any person, financial institution, or other entity.

DATED this 18th day of August, 2026.

Keith Cohon
Disciplinary Board Chairperson



Washington State Bar Association
1325 Fourth Ave, Suite 600
Seattle, WA 98101

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the Amended Order Appointing Custodians to Protect Clients' Interests to be emailed to the Office of General Counsel and to the Respondent's Counsel, Kevin M Bank, at kevin@kevinbanklaw.com, Respondent's Counsel, Angelo Calfo, at angelo@angelicalfo.com, Respondent's Counsel Harold Malkin, at harold@angelicalfo.com, Respondent's counsel Tyler Weaver, at tylerw@angelicalfo.com, on the 18th day of August, 2026.

________________________________________
Clerk to the Disciplinary Board

FILED

May 26, 2026

Disciplinary Board

Docket # 001

DISCIPLINARY BOARD
WASHINGTON STATE BAR ASSOCIATION

| | |
|---|---|
| In re<br><br>**ALEXANDRA LOZANO,**<br><br>Lawyer (Bar No. 40478). | Proceeding No. 25#00062<br><br>ODC File No(s). 24-01460, 24-01482, 24-01631, 24-01852, 25-01047, 25-01348, 25-01335, 25-01501, 25-01469, 25-01953, 25-01958, 25-01990, 25-02076, 25-02100, 25-02179, 25-02205, 25-02210, 26-00043, 26-00294, 26-00461, 26-00464<br><br>Resignation Form of Alexandra Lozano (ELC 9.3(b)) |

I, Alexandra Lozano, declare as follows:

1. I am over the age of eighteen years and am competent. I make the statements in this declaration from personal knowledge.

2. I was admitted to practice law in the State of Washington on October 27, 2008.

3. After consulting with my counsel, I have voluntarily decided to resign from the Washington State Bar Association (the Association) in Lieu of Discipline under Rule 9.3 of the Washington Supreme Court's Rules for Enforcement of Lawyer Conduct (ELC).

4. Attached hereto as Exhibit A is Disciplinary Counsel's statement of alleged misconduct for purposes of ELC 9.3(b). I am aware of the alleged misconduct stated in



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

Disciplinary Counsel's statement, but rather than defend against the allegations, I wish to permanently resign from membership in the Association.

5. Although I am choosing not to defend, I dispute the accuracy of the attached Exhibit A - Statement of Alleged Misconduct, and I deny any misconduct

6. I consent to entry of an order under ELC 13.9(e) assessing expenses of $1,500 in this matter.

7. I agree to pay any additional costs or restitution that may be ordered by a Review Committee under ELC 9.3(g).

8. I understand that my resignation is permanent and that any future application by me for reinstatement as a member of the Association is currently barred. If the Washington Supreme Court changes this rule or an application is otherwise permitted in the future, it will be treated as an application by one who has been disbarred for ethical misconduct. If I file an application, I will not be entitled to a reconsideration or reexamination of the facts, complaints, allegations, or instances of alleged misconduct on which this resignation was based.

9. I agree to (a) notify all other states and jurisdictions in which I am admitted, of this resignation in lieu of discipline; (b) seek to resign permanently from the practice of law in any other state or jurisdiction in which I am admitted; and (c) provide Disciplinary Counsel with copies of any such notification(s) and any response(s). I acknowledge that this resignation could be treated as a disbarment by all other jurisdictions.

10. I agree to (a) notify all other professional licensing agencies in any jurisdiction from which I have a professional license that is predicated on my admission to practice law of this resignation in lieu of discipline; (b) seek to resign permanently from any such license; and (c) provide disciplinary counsel with copies of any of these notifications and any responses.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

11. I agree that when applying for any employment, I will disclose the resignation in lieu of discipline in response to any question regarding disciplinary action or the status of my license to practice law.

12. I understand that my resignation becomes effective on Disciplinary Counsel's endorsement and filing of this document with the Clerk, and that under ELC 9.3(c) Disciplinary Counsel must do so promptly following receipt of this document.

13. When my resignation becomes effective, I agree to be subject to all restrictions that apply to a disbarred lawyer.

14. Upon filing of my resignation, I agree to comply with the same duties as a disbarred lawyer under ELC 14.1 through ELC 14.4.

15. I understand that, after my resignation becomes effective, it is permanent. I will never be eligible to apply and will not be considered for admission or reinstatement to the practice of law nor will I be eligible for admission for any limited practice of law.

16. I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

5/26/2026
Date and Place

Alexandra Lozano, Bar No. 40478

ENDORSED BY:

Marina Busse, Disciplinary Counsel
Bar No. 54411



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

# EXHIBIT A

DISCIPLINARY BOARD
WASHINGTON STATE BAR ASSOCIATION

| | |
|---|---|
| In re<br><br>**ALEXANDRA LOZANO,**<br><br>Lawyer (Bar No. 40478). | Proceeding No. 25#00062<br><br>ODC File No(s). 24-01460, 24-01482, 24-01631, 24-01852, 25-01047, 25-01348, 25-01335, 25-01501, 25-01469, 25-01953, 25-01958, 25-01990, 25-02076, 25-02100, 25-02179, 25-02205, 25-02210, 26-00043, 26-00294, 26-00461, 26-00464<br><br>STATEMENT OF ALLEGED MISCONDUCT UNDER ELC 9.3(b)(1) |

The following constitutes a Statement of Alleged Misconduct under Rule 9.3(b)(1) of the Washington Supreme Court's Rules for Enforcement of Lawyer Conduct (ELC).

## I. ADMISSION TO PRACTICE

1. Respondent Alexandra Lozano was admitted to the practice of law in the State of Washington on October 27, 2008.

## II. ALLEGED FACTS

2. Respondent is the sole owner and manager of Alexandra Lozano Immigration Law (ALIL).

3. ALIL primarily represents client on petitions for humanitarian visas filed with United



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

States Citizenship and Immigration Services (USCIS).

4. ALIL currently has over 35,000 clients. Respondent is currently listed as the lawyer of record for tens of thousands of clients with petitions pending before USCIS.

5. Respondent employs nonlawyer staff to conduct client consultations and deliver scripted sales pitches to prospective clients. In these consultations, the nonlawyer staff recommend strategies and provide legal advice about the effects of filing certain forms.

6. Respondent's scripts include false and misleading statements about what Respondent can accomplish for the prospective client, such as providing assurances of "100% protection" from Immigration and Customs Enforcement (ICE) upon filing certain applications.

7. Respondent uses a computer program to determine case strategies for immigration relief. Neither Respondent, nor any other ALIL lawyer, review the case strategies before they are pitched to the clients.

8. The majority of Respondent's clients apply for immigration benefits under the Violence Against Women Act (VAWA) or for T nonimmigrant status (T-visa), for which Respondent typically charges a flat fee of $10,000–$15,000.

9. Since approximately mid-2023, Respondent has referred clients to Salud Total, a company Respondent owns, for "immigration impact assessments" which Respondent requires for all clients. The assessments are not performed by licensed mental health professionals, but rather by laypersons with no professional qualifications. Salud Total charges up to $1,200 for these assessments. While Respondent discloses Respondent's financial interest in Salud Total to clients, Respondent does not disclose that Salud Total staff are not licensed mental health professionals.

10. In virtually all Respondent's VAWA applications, Respondent included an application



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

for adjustment of status to lawful permanent resident (AOS), regardless of whether the client was ultimately eligible for AOS. Respondent did not explain to clients the potential risks of USCIS denying an AOS application, which can include being placed in proceedings in immigration court.

11. One or more of Respondent's clients have been issued a Notice to Appear (NTA) in immigration court after USCIS denied their AOS applications.

12. One or more of Respondent's clients have been deported after their AOS petitions were denied.

13. Nonlawyer staff at ALIL answered questions from clients, prepared immigration petitions, assembled supporting documentation, and drafted client declarations with minimal supervision. Once the applications were completed, staff affixed Respondent's signature to the immigration forms, certifying under penalty of perjury that Respondent prepared the application, even in cases when Respondent had not done so.

14. Respondent directed ALIL staff to file the applications bearing Respondent's signature with USCIS, despite knowing that Respondent had not personally reviewed the cases.

15. As of March 17, 2026, Respondent's signature was on 53,923 petitions pending before USCIS.

16. Respondent directed ALIL staff to affix digitized replicas of client's signatures to immigration forms, even in instances where the form stated that a wet ink signature was required.

17. In one or more cases, ALIL affixed client signatures to immigration forms even when the clients did not review the documents.

18. One or more of the clients' applications were delayed or denied due to Respondent's failure to comply with signature requirements.

19. Respondent represented M.R.A. on applications for VAWA and AOS. Respondent



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

knew that M.R.A. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for M.R.A. USCIS denied M.R.A.'s AOS application. On April 30, 2025, the Department of Homeland Security (DHS) issued an NTA based on the information contained in the denied AOS application. M.R.A. paid Respondent a flat fee of $8,525 and $2,157.90 in costs. On October 8, 2024, M.R.A. filed a grievance against Respondent.

20. Respondent represented A.S.A. on applications for VAWA and AOS. Respondent knew that A.S.A. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for A.S.A. When USCIS scheduled an interview with A.S.A., nonlawyer staff at ALIL advised A.S.A. that ALIL should withdraw the AOS application because A.S.A. was not eligible for AOS. Respondent withdrew the AOS application. On October 23, 2025, DHS issued an NTA based on the information contained in the withdrawn AOS application. In total, A.S.A paid Respondent $13,000 in fees and $1,261.75 in costs. On October 29, 2024, A.S.A. filed a grievance against Respondent. On January 8, 2025, Respondent provided A.S.A. with a refund of $1,500.

21. Respondent represented J.C.A. on a T-visa application. According to J.C.A.'s grievance, ALIL staff affixed J.C.A.'s signature to a sworn declaration that was submitted in support of J.C.A.'s T-visa application and. J.C.A. did not personally review the declaration. According to J.C.A., J.C.A. subsequently discovered that ALIL staff had included false information in the declaration inconsistent with J.C.A.'s experience. J.C.A.'s T-visa application was denied based on the information in the declaration. In total, J.C.A. paid ALIL $9,500 in fees. On December 2, 2024, J.C.A. filed a grievance against Respondent.

22. Respondent represented Z.M.Q. on an application for VAWA and AOS. According to Z.M.Q.'s grievance, ALIL failed to promptly inform Z.M.Q. of USCIS's decision denying Z.M.Q.'s VAWA application, which negatively impacted Z.M.Q.'s ability to appeal. ALIL also



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

failed to promptly provide Z.M.Q.'s client file to new counsel. Z.M.Q. paid ALIL a fee of $13,150 and $1,261.75 in costs. On July 1, 2025, Z.M.Q. filed a grievance against Respondent.

23. Respondent represented T.B.J. on an application for VAWA and AOS. T.B.J. wished to include T.B.J.'s two minor children as derivative applicants. T.B.J. was falsely informed by nonlawyer staff that T.B.J.'s minor children could not be included as derivative applicants on T.B.J.'s VAWA application until the VAWA application was approved. ALIL then added additional charges to T.B.J.'s account of $4,500 per child to prepare and file two immigration forms per child. T.B.J. paid ALIL $8,650 in fees and $3,344.25 in costs. On April 14, 2025, ALIL refunded $5,500 to T.B.J. On August 5, 2025, T.B.J. filed a grievance against Respondent.

24. Respondent represented J.G.M.R. on an application for VAWA and AOS. Respondent knew J.G.M.R. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for J.G.M.R. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with J.G.M.R., when in fact Respondent had not done so. Nonlawyer staff falsely informed J.G.M.R. that J.G.M.R.'s employment authorization document would protect J.G.M.R. from deportation. In July 2025, J.G.M.R. received a notice from DHS that J.G.M.R. did not understand. J.G.M.R. called ALIL and asked to speak with a lawyer about the notice. Nonlawyer staff said they would "escalate" J.G.M.R.'s request. However, J.G.M.R. was never able to speak with a lawyer at ALIL about the notice. J.G.M.R. was subsequently detained by ICE. J.G.M.R. paid ALIL $10,500 in fees and $2,155 in costs. On August 11, 2025, J.G.M.R. filed a grievance against Respondent. In October 2025, J.G.M.R. was deported.

25. A.J.S. hired Respondent to file a family-based visa petition based on A.J.S.'s marriage to a U.S. citizen. A.J.S. only ever spoke with nonlawyers about A.J.S.'s case, even when USCIS



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

sent a Request for Evidence (RFE), requesting certain tax information. After being unable to communicate with any ALIL lawyer, A.J.S. submitted a response to the RFE. A.J.S.'s petition was denied on the basis that responsive tax information was not submitted in response to the RFE. In total, A.J.S paid $7,000 in fees to ALIL. On September 5, 2025, A.J.S. filed a grievance against Respondent.

26. Respondent represented C.V.P. and C.V.P.'s spouse on applications for a T-visa and AOS. Respondent filed C.V.P.'s AOS application based on C.V.P.'s approved T-visa before C.V.P was statutorily eligible for AOS. USCIS denied C.V.P.'s application but noted that C.V.P. could refile the application when C.V.P. became eligible. C.V.P. was eligible by the time USCIS issued its denial decision. Instead of refiling the AOS petition, ALIL nonlawyer staff advised C.V.P. to file a motion to reconsider. ALIL charged C.V.P. an additional $4,500 for the motion to reconsider, which was denied. After the denial of the motion to reconsider, C.V.P.'s T-visa had expired and C.V.P no longer had the ability to apply for AOS based on the approved T-visa. ALIL then advised C.V.P. to file an application to extend the T-visa which would cost an additional $4,500. C.V.P. refused to pay additional funds and ultimately ALIL agreed to file the extension for no additional cost. However, C.V.P. declined and hired a new lawyer. C.V.P. paid ALIL $23,100 in fees and more than $2,425 in costs. On September 8, 2025, C.V.P. filed a grievance against Respondent.

27. J.H.C. paid $150 to ALIL for a consultation conducted by a nonlawyer staff member, who referred J.H.C. to another lawyer. Respondent took 30% of a flat fee J.H.C. paid to the other lawyer. ALIL and Respondent did nothing on J.H.C.'s case aside from referring J.H.C. to the other firm, therefore the work Respondent performed was not proportionate to the division of the fee Respondent received. On November 13, 2025, J.H.C. filed a grievance against Respondent.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

28. A.M.M. paid $99 for a consultation with a nonlawyer staff member at ALIL, who advised A.M.M. to apply for a T-visa. A.M.M. hired Respondent to file the T-visa application. However, Respondent did not file the T-visa application. A.M.M. called ALIL to ask about the status of the case several times but was never permitted to speak with a lawyer. Finally, A.M.M. elected to terminate the representation. In total, A.M.M. paid $7,427 in fees to ALIL. On November 14, 2025, A.M.M. filed a grievance against Respondent.

29. Respondent represented J.L.S. on an application for VAWA and AOS. Respondent knew J.L.S. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for J.L.S. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with J.L.S, when in fact Respondent had not done so. ALIL also affixed J.L.S.'s signature to immigration forms and a sworn declaration without J.L.S. having reviewed the forms and declaration first. According to J.L.S.'s grievance, J.L.S. subsequently discovered that ALIL staff had included false information in the declaration. J.L.S.'s AOS application was denied. Neither Respondent, nor anyone at ALIL informed J.L.S. about the right to appeal within 30 days of the denial. J.L.S. paid $10,650 in fees and $1,260 in costs to ALIL. On November 19, 2025, J.L.S. filed a grievance against Respondent.

30. Respondent represented D.B.D. on an application for VAWA and AOS. Respondent knew D.B.D. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for D.B.D. USCIS denied D.B.D.'s AOS application. D.B.D. paid at least $13,150 in fees to ALIL. On November 24, 2025, D.B.D. filed a grievance against Respondent.

31. ALIL represented M.B.A. and M.B.A.'s sibling in an appeal from the denial of M.B.A.'s asylum application. ALIL failed to advise M.B.A. that M.B.A. was likely eligible for relief under VAWA, or that M.B.A.'s sibling was likely eligible for relief as a Special Immigrant



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

Juvenile (SIJ). ALIL staff affixed Respondent's signature on the appeal, Form EOIR-27, and the appeal brief, although Respondent never reviewed any of the documents filed. Respondent failed to raise multiple potential grounds for relief in the asylum appeal. The appeal was denied. According to M.BA.'s grievance, ALIL failed to inform M.B.A. of the denial. M.B.A. paid ALIL $6,500 in fees and $675 in costs. On December 1, 2025, M.B.A filed a grievance against Respondent.

32. Respondent represented M.G.A. on an application for VAWA and AOS. Respondent knew M.G.A. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for M.G.A. USCIS denied M.G.A.'s application. M.G.A. paid ALIL at least $10,650 in fees and $1,261.75 in costs. On December 23, 2025, M.G.A. filed a grievance against Respondent.

33. Respondent represents M.V.G. on an application for asylum. M.V.G.'s case was handled entirely by nonlawyer staff. ALIL staff did not permit M.V.G. to speak with a lawyer about the case, despite multiple requests made by M.V.G. Despite this, Respondent charged M.V.G. a flat fee of $15,800. M.V.G. paid ALIL $11,970.55 in fees and $2,385 in costs. On December 23, 2025, M.V.G. filed a grievance against Respondent.

34. Respondent represented E.C.L. on an application for VAWA, a request to waive inadmissibility, and AOS. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with E.C.L., when in fact Respondent had not done so. The request to waive inadmissibility and AOS were both denied because ALIL affixed a copy of E.C.L.'s signature to the applications and the forms required a wet signature. ALIL quoted a fee of $2,500-3,500 to appeal the denial of the AOS application. E.C.L. paid at least $21,340 in fees to ALIL. On December 26, 2025, E.C.L. filed a grievance against Respondent.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

35. Respondent represented C.P.N. on an application for VAWA and AOS. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with C.P.N., when in fact Respondent had not done so. USCIS determined that C.P.N.'s signature on the form was not a wet ink signature as required, and asked that C.P.N. submit a new application form with a wet ink signature. ALIL appealed USCIS's decision and argued that the signature was a wet-ink signature under applicable regulations. However, ALIL did not file a new AOS application form as required by USCIS. C.P.N.'s application was denied. C.P.N. paid at least $13,200 in fees and at least $1,760 in costs to ALIL. On January 9, 2026, C.P.N. filed a grievance against Respondent.

36. On August 27, 2024, J.R.R. paid ALIL $99 for an initial consultation with a nonlawyer ALIL staff member, who advised that J.R.R. was eligible to apply for VAWA and AOS. On August 29, 2024, J.R.R. paid Respondent a flat fee of $9,500 for the VAWA and AOS applications. By May 2, 2025, ALIL had everything it needed to submit the applications except for J.R.R.'s signature on the forms. On September 4, 2025, J.R.R. called ALIL to confirm that they had received J.R.R.'s signed forms. ALIL did not file the VAWA or AOS applications. J.R.R. was detained by ICE. ALIL informed J.R.R.'s representatives that ALIL could not provide further assistance. J.R.R. requested a refund of the flat fee, as the VAWA and AOS applications had not been filed. ALIL declined to provide a refund. J.R.R. requested an accounting of how the flat fee was used. ALIL did not provide an accounting or a refund. ALIL did not file the VAWA or AOS petitions. On February 11, 2026, J.R.R. filed a grievance against Respondent.

37. Respondent represented S.C.G. on an application for VAWA and AOS. S.C.G. paid a flat fee of $10,400 and costs of $1,250 for the VAWA and AOS applications. Respondent knew S.C.G. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for S.C.G.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

USCIS denied S.C.G.'s AOS application. Nonlawyer ALIL staff members then advised S.C.G. that the denial could be overcome through an appeal. S.C.G. paid a flat fee of $2,500 and $1,653.15 in costs for the appeal. The argument ALIL presented in support of the appeal had no basis in law or fact. The appeal was denied on the same grounds as AOS application. In total, S.C.G. paid at least $12,900 in fees and $2,903.15 in costs to ALIL. On March 5, 2026, S.C.G. filed a grievance against Respondent.

38. Respondent represented G.V.N. on an application for VAWA and AOS. Respondent knew G.V.N. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for G.V.N. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had prepared the application and reviewed it with G.V.N., when in fact Respondent had not done so. ALIL staff later told G.V.N. that G.V.N. was not eligible for AOS, and that the AOS application was submitted solely to allow G.V.N. to obtain a work permit. On March 5, 2026, G.V.N. filed a grievance against Respondent alleging that ALIL and/or Respondent had misled G.V.N. about G.V.N.'s eligibility for AOS and that G.V.N. would not have agreed to pay the fee if G.V.N. had known G.V.N. was ineligible for AOS. G.V.N. paid $150 for an initial consultation, a flat fee of $12,500 and costs of $1,225 for the VAWA and AOS applications. On March 5, 2026, G.V.N. filed a grievance against Respondent.

## III. ALLEGED MISCONDUCT

39. By directing staff to utilize a script that contained false and/or misleading information when communicating with prospective clients, it appears that Respondent violated RPC 8.4(c).

40. By filing applications for immigration benefits with USCIS when Respondent knew the clients were ineligible for those benefits, Respondent violated RPC 3.1 and RPC 8.4(d).

41. By utilizing nonlawyers to perform legal functions on behalf of clients, and/or by



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

delegating legal functions to nonlawyer staff such as performing client consultations and providing legal advice and/or by providing Respondent's signature stamp for nonlawyer staff to affix to documents that Respondent did not personally review, it appears that Respondent violated RPC 5.5(a).

42. By failing to adequately supervise nonlawyer staff who performed legal functions and affixed Respondent's signature to filings, Respondent violated RPC 5.3(b).

43. By referring clients to Salud Total without disclosing that evaluations were performed by unlicensed individuals, Respondent violated RPC 1.7(a)(2).

44. By directing staff to submit forms to USCIS bearing signatures that falsely certified that Respondent had prepared the forms, Respondent engaged in dishonesty and conduct prejudicial to the administration of justice in violation of RPC 8.4(c) and RPC 8.4(d).

45. By charging unreasonable fees for work performed by nonlawyers and for preparation of applications for which the clients were ineligible, Respondent violated RPC 1.5(a).

Dated this 26th day of May 2026,

Marina Busse, Disciplinary Counsel
Bar No. 54411



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

# EXHIBIT 3

When recorded return to:

Alexandra Lozano and Magaly Lozano-Perea
20511 Southeast 261st Place
Covington, WA 98042

$1207.50
OLD REPUBLIC TITLE LTD
17-32215

## STATUTORY WARRANTY DEED

**THE GRANTOR(S) Peter Hattrup and Heather Hattrup, husband and wife**

for and in consideration of $10.00 and other good and valuable consideration
in hand paid, conveys, and warrants to Alexandra Lozano and Magaly Lozano-Perea, unmarried persons
the following described real estate, situated in the County of King, State of Washington:

See "Exhibit A" attached hereto and made a part hereof.

Subject to: see attached Exhibit "B"

Abbreviated Legal: Lot 12, FOREST CREST ESTATES

Tax Parcel Number(s): 259178012003

LPB 10-05

Dated: 7/12/2023

[signature]
Peter Hattrup

[signature]
Heather Hattrup

State of Washington
County of KING

This record was acknowledged before me on 7-12- by Peter and Heather Hattrup.

[signature]
Notary Public

My commission expires: 10-27-2025

ARTHUR VASQUEZ
196899
NOTARY
PUBLIC
COMMISSION EXPIRES 10-27-25
STATE OF WASHINGTON

LPB 10-05

**ORDER NO. :** 5217032215

# EXHIBIT A

The land referred to is situated in the County of King, City of Covington, State of Washington, and is described as follows:

Lot 12, FOREST CREST ESTATES, according to the plat thereof recorded in Volume 213 of Plats, pages 61 and 62, records of King County, Washington.

SITUATE in the County of King, State of Washington.

Property Address: 20511 Southeast 261st Place, Covington, WA 98042

**ABBREVIATED LEGAL**

Lot 12, FOREST CREST ESTATES

Tax Account No. 259178-0120-03

Exhibit "B"

Terms and provisions as contained in an instrument,

Entitled : Deed
Executed By : Mountain Development Company, a Washington corporation
Dated : October 10, 1955
Recorded : October 25, 1955 in Official Records under Recording Number 4630183

Which, among other things, provides: Reservations and exceptions

No examination has been made as to the present ownership or encumbrances of the reserved mineral estate.

An easement affecting that portion of said land and for the purposes stated herein and incidental purposes as provided in the following

Granted To : Puget Sound Power and Light Company, a Washington corporation
For : Underground electric transmission and distribution line
Recorded : December 14, 1993 in Official Records under Recording Number 9312142170
Affects : Portion of said Premises

Contains covenant prohibiting structures over said Easement or other activity which might endanger the underground system.

Agreement for : Individual on-site sewage system
Executed By : Soos Creek Water and Sewer District, a Washington municipal corporation
and Between : Bill Orth

On the terms, covenants and conditions contained therein,

Dated : April 14, 1995
Recorded : April 14, 1995 in Official Records under Recording Number 9504140786

Terms and provisions as contained in an instrument,

Entitled : Covenant and Agreement Prohibiting Improvements in building set back
Recorded : February 6, 1998 in Official Records under Recording Number 9802060333

Covenants, conditions, restrictions, easements, provisions dedications and matters delineated or disclosed by the plat of Forest Crest Estates; Refer to the plat for full particulars.

Said Plat recorded April 9, 2003 in Official Records under Recording Number 20030409001090.

Covenants, Conditions, Restrictions, Limitations, Easements, Assessments, Reservations, Exceptions, Terms, Liens or Charges, but omitting any covenants or restrictions if any, based upon race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that said covenant (a) is exempt under Title 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons, as provided in an instrument.

Recorded : May 9, 2003 in Official Records under Recording Number 20030509002449

Modification thereof, but omitting any covenants or restrictions if any, based upon race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that said covenant (a) is exempt under Title 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons.

Recorded : October 6, 2003 in Official Records under Recording Number 20031006002293

Assessments that may be levied, as follows:

For/By : Forest Crest Estates Homeowners' Association

# EXHIBIT 4

**Return To:** U.S. Bank Home Mtg
U.S. Bank - CIC Retail EP-MN-X3CI
9380 Excelsior Blvd, 3rd Floor
Hopkins, MN 55343

**Assessor's Parcel or Account Number:** 259178-0120-03
**Abbreviated Legal Description:** Lot 12, Forest Crest Estates
**Prepared By:** Shoua Vang
7601 Penn Ave S
Minneapolis, MN 55423
**Full legal description located on page:** 4
**Grantor(s):** Magaly Lozano-Perea and Alexandra Lozano, unmarried persons
**Grantee(s):** U.S. Bank National Association
**Trustee:** U.S. Bank Trust Company, National Association
**Lender:** U.S. Bank National Association

29/232.50
OLD REPUBLIC TITLE LTD
17-32215

# Deed of Trust

**Definitions.** Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

**Parties**

**(A)** *"Borrower"* is Alexandra Lozano and Magaly Lozano-Perea. Magaly Lozano-Perea currently residing at 10542 SE 228th St, Kent, WA 98031 and Alexandra Lozano currently residing at 121 Stewart St, Seattle, WA 98101. Borrower is the trustor under this Security Instrument.

**(B)** *"Lender"* is U.S. Bank National Association. Lender is a national bank organized and existing under the laws of the United States of America. Lender's address is 2800 Tamarack Road, Owensboro, KY 42301. Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

**(C)** *"Trustee"* is U.S. Bank Trust Company, National Association. Trustee's address is 111 SW Fifth Avenue, Portland, OR 97204. The term "Trustee" includes any substitute/successor Trustee.

**Documents**

**(D)** *"Note"* means the promissory note dated July 21, 2023, and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender Five hundred eighty eight thousand and 00/100 Dollars (U.S. $588,000.00) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than August 1, 2053.

**(E)** *"Riders"* means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ MERS Rider |
| ☐ 1-4 Family Rider | ☒ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ Second Home Rider | ☐ VA Rider | |

**(F)** *"Security Instrument"* means this document, which is dated July 21, 2023, together with all Riders to this document.

**Additional Definitions**

**(G)** *"Applicable Law"* means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(H)** *"Community Association Dues, Fees, and Assessments"* means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association, or similar organization.

**(I)** *"Default"* means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).

(J) *"Electronic Fund Transfer"* means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

(K) *"Electronic Signature"* means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

(L) *"E-SIGN"* means the Electronic Signatures in Global and National Commerce Act (15 *U.S.C.* § 7001 et seq.), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

(M) *"Escrow Items"* means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

(N) *"Loan"* means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(O) *"Loan Servicer"* means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

(P) *"Miscellaneous Proceeds"* means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(Q) *"Mortgage Insurance"* means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

(R) *"Partial Payment"* means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

(S) *"Periodic Payment"* means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

(T) *"Property"* means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."

(U) *"Rents"* means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.

(V) *"RESPA"* means the Real Estate Settlement Procedures Act (12 *U.S.C.* § 2601 et seq.) and its implementing regulation, Regulation X (12 *C.F.R.* Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(W) *"Successor in Interest of Borrower"* means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

(X) *"UETA"* means the *Uniform Electronic Transactions Act*, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**Transfer of Rights in the Property.** This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of King:

See Attached Legal Description

Parcel ID Number(s): 259178-0120-03

which currently has the address of 20511 SE 261st Pl, Covington, Washington 98042 (*"Property Address"*);

TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, royalties, mineral rights, oil or gas rights or profits, water rights, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific Washington state requirements to constitute a uniform security instrument covering real property.

**Uniform Covenants.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Acceptance and Application of Payments or Proceeds.**

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

**(c) Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

**(d) No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.**

**(a) Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow Items (the *"Funds"*). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

**(b) Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver, Borrower must pay directly, when and where payable, the amounts due for any Escrow Items subject to the waiver. If Lender has waived the requirement to pay Lender the Funds for any or all Escrow Items, Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly pursuant to a waiver, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

**(c) Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**(d) Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items unless prohibited by Applicable Law. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the *"Required Actions"*). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

**(a) Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

**(b) Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender

will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(c) Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee.

**(d) Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(e) Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**7. Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Subject to Applicable Law, Lender may make reasonable entries upon and inspections of the Property and/or may inspect the interior of the improvements on the Property.

**8. Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

## 9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.

**(a) Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or (iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs, and other fees and costs associated with the enforcement of this Security Instrument, including but not limited to foreclosure trustee and sheriff's fees and costs; (B) property inspection and valuation fees, unless prohibited by Applicable Law; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

**(b) Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

**(c) Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(d) Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

## 10. Assignment of Rents.

**(a) Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party (*"Tenant"*), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the

Rents are payable. Borrower authorizes Lender to collect the Rents, and agrees that each Tenant will pay the Rents to Lender. However, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

**(b) Notice of Default.** If Lender gives notice of Default to Borrower: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

**(c) Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

**(d) Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

**(e) No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

**(f) Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

**(g) Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

**11. Mortgage Insurance.**

**(a) Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately

designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

**(b) Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 *U.S.C.* § 4901 et seq.), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter (*"HPA"*). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/

or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**12. Assignment and Application of Miscellaneous Proceeds; Forfeiture.**

**(a) Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

**(b) Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(c) Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a *"Partial Devaluation"*) where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

**(d) Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. *"Opposing Party"* means the third party that owes Borrower the Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

**(e) Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights such as dower and curtesy and any available homestead exemptions; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released

from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**15. Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and (ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

**(b) Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other related fees.

**(c) Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

**(d) Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**16. Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

**(a) Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(b) Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication (*"Electronic Communication"*) if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address (*"Electronic Address"*); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

**(c) Borrower's Notice Address.** The address to which Lender will send Borrower notice (*"Notice Address"*) will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

**(d) Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(e) Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**17. Governing Law; Severability; Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of Washington. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken.

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any

reference to *"Section"* in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**18. Borrower's Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon

Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

**(a) Definitions.** As used in this Section 24: (i) *"Environmental Law"* means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) *"Hazardous Substances"* include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) *"Environmental Cleanup"* includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an *"Environmental Condition"* means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**(b) Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to

the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**(c) Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**25. Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower (*"Borrower's Electronic Signature"*) instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.**

**(a) Notification of Default.** Lender will give a notification of Default to Borrower prior to acceleration following Borrower's Default, except that such notification of Default will not be sent when Lender exercises its right under Section 19 unless Applicable Law provides otherwise. The notification will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notification is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notification may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction; (v) Borrower's right to reinstate after acceleration or commencement of the foreclosure in accordance with Applicable law; and (vi) any other matters required to be included in the notification by Applicable Law.

**(b) Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notification, Lender, and in accordance with Applicable Law, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power

of sale and/or any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs, and other fees and costs associated with the enforcement of this Security Instrument, including but not limited to, foreclosure trustee's and sheriff's fees and costs, and title costs; (ii) property inspection and valuation fees; and (iii) any other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument unless prohibited by Applicable Law.

**(c) Foreclosure Notices; Sale of Property.** If Lender invokes the power of sale, Lender will send notice to Trustee of the occurrence of an event of Default and of Lender's election to cause the Property to be sold. Trustee and/or Lender will take such action regarding any required notices and will give such notices to Borrower and to other recipients as Applicable Law may require. At a time permitted, in accordance with Applicable Law, and after publication of the notice of sale, Trustee, without further demand on Borrower, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

**(d) Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed will be prima facie evidence of the truth of the statements made in that deed. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs; (ii) to all sums secured by this Security Instrument; and (iii) the surplus, if any, less the clerk's filing fee, shall be deposited, together with all documents required under Applicable Law, with the clerk of the superior court of the county in which the sale took place.

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender will request Trustee to reconvey the Property and will surrender this Security Instrument and all Notes evidencing the debt secured by this Security Instrument to Trustee. Upon such request, Trustee will reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons will pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**28. Substitute Trustee.** In accordance with Applicable Law, Lender may, from time to time, by itself or through the Loan Servicer, or any other authorized representative, appoint a successor trustee to any Trustee appointed under this Security Instrument who has ceased to act. Without conveyance of the Property, the successor trustee will succeed to all the rights, title, power, and duties conferred upon Trustee in this Security Instrument and by Applicable Law.

**29. Use of Property.** The Property is not used principally for agricultural purposes.

**30. Attorneys' Fees.** Lender will be entitled to recover in any action or proceeding to construe or enforce any term of this Security Instrument (a) its reasonable attorneys' fees and costs, and (b) any other fees and costs associated with the enforcement of this Security Instrument, including but not limited to, foreclosure trustee and sheriff's fees and costs and title costs. The term "attorneys' fees," whenever used in this Security Instrument, includes without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

**Borrower**

Magaly Lozano-Perea

Alexandra Lozano

**Acknowledgment**

State of Washington

County of King

This record was acknowledged before me on 07/21/2023 by Magaly Lozano-Perea.

*Notary Public*

My commission expires: June 5, 2026

MICHELLE BARBA
Notary Public
State of Washington
Commission # 22019350
My Comm. Expires Jun 5, 2026

**Acknowledgment**

State of Washington

County of King

This record was acknowledged before me on 07/21/2023 by Alexandra Lozano.

*Notary Public*

My commission expires: June 5, 2026

Loan Origination Organization: U.S. Bank National Association

NMLS ID: 402761

Loan Originator: Brent Joseph Cahill

NMLS ID: 227423

**ORDER NO. :** 5217032215

# EXHIBIT A

The land referred to is situated in the County of King, City of Covington, State of Washington, and is described as follows:

Lot 12, FOREST CREST ESTATES, according to the plat thereof recorded in Volume 213 of Plats, pages 61 and 62, records of King County, Washington.

SITUATE in the County of King, State of Washington.

Property Address: 20511 Southeast 261st Place, Covington, WA 98042

**ABBREVIATED LEGAL**

Lot 12, FOREST CREST ESTATES

Tax Account No. 259178-0120-03

# Planned Unit Development Rider

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 21st day of July, 2023, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the *"Security Instrument"*) of the same date, given by the undersigned (the *"Borrower"*) to secure Borrower's Note to U.S. Bank National Association (the *"Lender"*) of the same date and covering the Property described in the Security Instrument and located at:

20511 SE 261st Pl, Covington, WA 98042

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Covenants, Conditions and Restrictions. (the *"Declaration"*). The Property is a part of a planned unit development known as

Forest Crest Estate

[Name of Planned Unit Development]

(the *"PUD"*). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the *"Owners Association"*) and the uses, benefits, and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**(A) PUD Obligations.** Borrower will perform all of Borrower's obligations under the PUD's Constituent Documents. The *"Constituent Documents"* are the: (i) Declaration; (ii) articles of incorporation, trust instrument, or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower will promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**(B) Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance, then (i) Lender waives the provision in Section 3 for the portion of the Periodic Payment made to Lender consisting of the yearly premium installments for property insurance on the Property, and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower will give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and will be paid to Lender. Lender will apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**(C) Public Liability Insurance.** Borrower will take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**(D) Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and will be paid to Lender. Such proceeds will be applied by Lender to the sums secured by the Security Instrument as provided in Section 12.

**(E) Lender's Prior Consent.** Borrower will not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents unless the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**(F) Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F will become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts will bear interest from the date of disbursement at the Note rate and will be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

**Borrower**

Magaly Lozano Perez

2201607332

MULTISTATE PLANNED UNIT DEVELOPMENT RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

Form 3150 07/2021
03/2022
Page 2 of 3

20230719 23.2.0.5043-J20230329Y

Alexandra Lozano

# Rider-Adjustable Rate

## One Year Treasury Index - Rate Caps

THIS ADJUSTABLE RATE RIDER is made this 21st day of July, 2023, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the *"Security Instrument"*) of the same date given by the undersigned (the *"Borrower"*) to secure Borrower's Adjustable Rate Note (the *"Note"*) to U.S. Bank National Association (the *"Lender"*) of the same date and covering the property described in the Security Instrument and located at:

20511 SE 261st Pl, Covington, WA 98042
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.

**Additional Covenants.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Interest Rate and Monthly Payment Changes.** The Note provides for monthly payments of interest and a portion of the principal (*"Monthly Payment"*) and an initial interest rate of 6.625%. The Note provides for changes in the interest rate and the Monthly Payments as follows:

**4. Interest Rate and Monthly Payment Changes.**

**(A) Change Dates.** The interest rate I will pay may change on the 1st day of August, 2030, and on the 1st day of the month every year thereafter. Each date on which my interest rate could change is called a *"Change Date."*

**(B) The Index.** Beginning with the first Change Date, my interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the *"Administrator"*). The *"Index"* is a benchmark, known as the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year index. The Index is currently published weekly in the Wall Street Journal. The most recent Index value available as of the date 45 days before each Change Date is called the *"Current Index,"* provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes.** Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three quarters percentage points (2.75%) (the *"Margin"*) to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will then round the result of the Margin plus the Current Index to the nearest zero and one eighth percentage point (.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the Monthly Payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my Monthly Payment.

**(D) Limits on Interest Rate Changes.** The interest rate I am required to pay at the first Change Date will not be greater than 11.625% or less than 2.75%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2%) from the rate of interest I have been paying for the preceding year, and will never be greater than 11.625% or less than 2.75%.


© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

**(E) Effective Date of Changes.** My new interest rate will become effective on each Change Date. I will pay the amount of my new Monthly Payment beginning on the first Monthly Payment date after the Change Date until the amount of my Monthly Payment changes again.

**(F) Notice of Changes.** The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my Monthly Payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin.** The Index is deemed to be no longer available and will be replaced if any of the following events (each, a *"Replacement Event"*) occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the *"Replacement Index"*) and may also select a new margin (the *"Replacement Margin"*), as follows:

1. If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.
2. If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and Monthly Payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**B. Transfer of the Property or a Beneficial Interest in Borrower.**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 19 of the Security Instrument will read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further


© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 19 of the Security Instrument described in Section B1 above will then cease to be in effect, and the provisions of Section 19 of the Security Instrument will be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law. Lender also will not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises this option to require immediate payment in full, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

**Borrower**

Magaly Lozano-Perea (signature)

Alexandra Lozano (signature)


© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# EXHIBIT 5

**When recorded return to:**
Ahmad Husam Rabi, a married person as a separate estate
17910 SE 224th Street
Kent, WA 98042

**Insured by Chicago Title: 0264259-04**

Filed for record at the request of:

CHICAGO TITLE
COMPANY OF WASHINGTON

15215 SE 272nd St., Suite 101
Kent, WA 98042

Escrow No.: 0264259-04

## STATUTORY WARRANTY DEED

THE GRANTOR(S) Alexandra Lozano and Manuel Lozano Rodriguez, a married couple

for and in consideration of Ten And No/100 Dollars ($10.00) , and other valuable consideration in hand paid, conveys and warrants to **Ahmad Rabi, a married person as a separate estate**

the following described real estate, situated in the County of King, State of Washington:

THE EAST QUARTER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 12, TOWNSHIP 22 NORTH, RANGE 5 EAST, W.M., IN KING COUNTY, WASHINGTON;

LESS COUNTY ROAD;

SITUATE IN THE COUNTY OF KING, STATE OF WASHINGTON.

Abbreviated Legal: (Required if full legal not inserted above.)

Tax Parcel Number(s): 122205-9016-08

Subject to:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

744C60C2-ED8F-402E-BD25-A497500B9E26 --- 2023/11/14 11:53:55 -8:00 --- Remote Notary

## STATUTORY WARRANTY DEED
(continued)

Dated: 11/14/2023

Alexandra Lozano
Alexandra Lozano

Manuel Lozano
Manuel Lozano Rodriguez

State of WASHINGTON

County of King

This record was acknowledged before me on
11/14/2023 by Alexandra Lozano and Manuel Lozano Rodriguez.

LB Yuen
(Signature of notary public)
Notary Public in and for the State of Washington
My commission expires: 11/09/2027

L B YUEN
NOTARY PUBLIC STATE OF WASHINGTON
**Commission # 210977**
My Commission Expires Nov 09, 2027

Notarial act performed by audio-visual communication

744C60C2-ED8F-402E-BD25-A497500B9E26 --- 2023/11/14 11:53:55 -8:00 --- Remote Notary



DocVerify ID: 744C60C2-ED8F-402E-BD25-A497500B9E26
www.docverify.com Page 13 of 28 13A497500B9E26

## EXHIBIT "A"
Exceptions

Exceptions Set forth on attached exhibit and by this reference made a part hereof as if fully incorporated herein.

1. Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

   Granted to: Pacific Telephone and Telegraph Company
   Purpose: communication facilities
   Recording Date: February 24, 1922
   Recording No.: 1592264
   Affects: southerly portion of said premises

2. Notice of Charges by water, sewer, and/or storm and surface water utilities and the terms and conditions thereof:

   Recording Date: April 28, 1993
   Recording No.: 9304282240

3. Declaration of Covenant Individual Water Supply and the terms and conditions thereof:

   Recording Date: December 15, 2004
   Recording No.: 20041215002113

   and

   Recording Date: August 21, 2008
   Recording No.: 20080821000665

4. Sensitive Area Notice on Title and the terms and conditions thereof:

   Recording Date: May 6, 2005
   Recording No.: 20050506000949

5. Forested Open Space and Native Growth Retention Area Covenant and the terms and conditions thereof:

   Recording Date: May 6, 2005
   Recording No.: 20050506000950

6. Affidavit Regarding Accessory Dwelling Unit and the terms and conditions thereof:

   Recording Date: May 6, 2005
   Recording No.: 20050506000951

7. Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

   Granted to: Puget Sound Energy, Inc
   Purpose: Transmission, distribution and sale of gas and electricity
   Recording Date: December 12, 2005
   Recording No.: 20051212000036
   Affects: Portion of said premises

8. Notice of Onsite Sewage System Operation and Maintenance Requirements and the terms and conditions thereof:

   Recording Date: August 29, 2006
   Recording No.: 20060829000050

9. City, county or local improvement district assessments, if any.



744C60C2-ED8F-402E-BD25-A497500B9E26 — 2023/11/14 11:53:55 8:00 — Remote Notary

DocVerify ID: 744C60C2-ED8F-402E-BD25-A497500B9E26
www.docverify.com Page 14 of 28 14A497500B9E26

Return To:
JPMorgan Chase Bank, N.A.
C/O Nationwide Title Clearing, LLC
2100 Alt. 19 North
Palm Harbor, FL 34683

**Loan Number 1318774018**

# DEED OF RECONVEYANCE

**WHEREAS, ALEXANDRA LOZANO AND MANUEL LOZANO RODRIGUREZ** was the original Trustor, **WFG NATIONAL TITLE** was the original Trustee, and **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS DESIGNATED NOMINEE FOR FAIRWAY INDEPENDENT MORTGAGE CORPORATION, BENEFICIARY OF THE SECURITY INSTRUMENT, ITS SUCCESSORS AND ASSIGNS** was the designated nominee of the original Beneficiary under that certain Deed of Trust dated 09/27/2019, in the amount of $1,024,000.00, and recorded in **KING** County, **Washington**, under **Auditor File # 20190930002608**.

PTN SEC 12, TWN 22N, RNG 5E

Parcel ID # 122205-9016

**NATIONWIDE TITLE CLEARING, LLC**, as successor Trustee under said Deed of Trust and as successor Trustee, having received from the designated nominee of the present Beneficiary under said Deed of Trust a written request to reconvey, reciting that the obligation(s) secured by the Deed of Trust have been fully satisfied, does hereby grant, bargain, sell and reconvey, unto the parties entitled thereto all right, title and interest which was heretofore acquired by said Trustee under said Deed of Trust.

Dated this 11th day of December in the year 2023

**NATIONWIDE TITLE CLEARING, LLC**

Mary Mojica

**MARY MOJICA**
**VICE PRESIDENT**

STATE OF FLORIDA
COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization on this 11th day of December in the year 2023, by Mary Mojica as VICE PRESIDENT of NATIONWIDE TITLE CLEARING, LLC, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

Tanner Dickson

**TANNER DICKSON**
**COMM EXPIRES: 10/01/2024**

TANNER DICKSON
Notary Public - State of Florida
Commission # HH 049515
My Comm. Expires Oct 1, 2024
Bonded through National Notary Assn.

CHAS7 439775726 MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS) MIN 1003924112048817848 MERS PHONE 1-888-679-6377 MERS Mailing Address: P.O. Box 2026, Flint, MI 48501-2026 DOCR T112312-10:59:43 [C-2] ERCNWA1

*D0103740577*

# EXHIBIT 6

When Recorded Return To:
U.S. Bank
C/O Nationwide Title Clearing,
LLC 2100 Alt. 19 North
Palm Harbor, FL 34683

Loan Number 2201607332

# DEED OF RECONVEYANCE

**WHEREAS, ALEXANDRA LOZANO AND MAGALY LOZANO-PEREA, UNMARRIED PERSONS** was the original Trustor, **U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION** was the original Trustee, and **U.S. BANK NATIONAL ASSOCIATION** was the original Beneficiary under that certain Deed of Trust dated 07/21/2023, in the amount of $588,000.00, and recorded in **KING** County, **WASHINGTON**, under **Auditor File # 20230721000356**.

LOT 12, FOREST CREST ESTATES
Parcel ID #: 259178-0120-03

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**, as Trustee under said Deed of Trust and as Trustee, having received from the present Beneficiary under said Deed of Trust a written request to reconvey, reciting that the obligation(s) secured by the Deed of Trust have been fully satisfied, does hereby grant, bargain, sell and reconvey, unto the parties entitled thereto all right, title and interest which was heretofore acquired by said Trustee under said Deed of Trust.

**Dated this 15th day of March in the year 2024**
**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**

**By:** ______________________
**Jeanette A. Bean**
**OFFICER**

STATE OF KENTUCKY
COUNTY OF DAVIESS
This foregoing instrument was acknowledged before me on this 15th day of March in the year 2024 by Jeanette A. Bean as OFFICER of U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION. He/she/they is (are) personally known to me.

______________________
Starla Brown
Notary Public - STATE OF KENTUCKY
Commission expires: 11/28/2024

STARLA BROWN
NOTARY PUBLIC
STATE AT LARGE
KENTUCKY
ID. #KYNP17928
MY COMMISSION EXPIRES NOV. 28, 2024

USRPD 440521999 T152403-09:08:49 [C-1] ERCNWA14

*D0105004510*

# EXHIBIT 7

AFTER RECORDING MAIL TO:

Five Star Legacy Trust
500 Elliot West #404
Seattle, WA 98119

FATCO
Home Builder
File: 4059289

Filed for Record at Request of:
First American Title Insurance Company

Space above this line for Recorders use only

## STATUTORY WARRANTY DEED

File No: **4059289 (TP)**

Grantor(s): **1613 Second Avenue, LLC, a Delaware limited liability company**
Grantee(s): **Alexandra Lozano, as trustee of the Five Star Legacy Trust, dated April 25, 2023**
Abbreviated Legal: **UNIT 3504, THE EMERALD, VOL. 315, P. 11-61, KING COUNTY**
Additional Legal on page:
Assessor's Tax Parcel No(s): **232971251003**

DS
JL

**THE GRANTOR(S) 1613 Second Avenue, LLC, a Delaware limited liability company** for and in consideration of **Ten Dollars and other Good and Valuable Consideration**, in hand paid, conveys and warrants to **Alexandra Lozano, as trustee of the Five Star Legacy Trust, dated April 25, 2023**, the following described real estate, situated in the County of King, State of Washington.

**LEGAL DESCRIPTION:** Real property in the County of King, State of Washington, described as follows:

**UNIT 3504, THE EMERALD, A CONDOMINIUM, ACCORDING TO DECLARATION THEREOF RECORDED UNDER KING COUNTY RECORDING NO. 20201208002087, AND ANY AMENDMENTS THERETO; SAID UNIT IS LOCATED ON SURVEY MAP AND PLANS FILED IN VOLUME 315 OF CONDOMINIUMS, PAGE(S) 11 THROUGH 61, IN KING COUNTY, WASHINGTON.**

Subject To: This conveyance is subject to covenants, conditions, restrictions and easements, if any, affecting title, which may appear in the public record, including those shown on any recorded plat or survey.

Statutory Warranty Deed
- continued

Dated: MAY 31, 2023

1613 Second Avenue, LLC, a Delaware limited liability company

By: ______________________
Name: Jing Zhao
Title: Authorized Signer

STATE OF Washington )
)-ss
COUNTY OF King )

This record was acknowledged before me on 5-31-23 by **Jing Zhao** as **Authorized Signer** of **1613 Second Avenue, LLC.**

DAVID E JOHANSEN
NOTARY PUBLIC #83380
STATE OF WASHINGTON
COMMISSION EXPIRES
JULY 29, 2026

David E. Johansen
Notary Public
My commission expires: July 29, 2026



LPB 10-05

# EXHIBIT 8

When Recorded Return To:
U.S. Bank
C/O Nationwide Title Clearing,
LLC 2100 Alt. 19 North
Palm Harbor, FL 34683

Loan Number 2201579332

# DEED OF RECONVEYANCE

**WHEREAS, ALEXANDRA LOZANO, AS TRUSTEE OF THE FIVE STAR LEGACY TRUST, DATED APRIL 25, 2023** was the original Trustor, **U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION** was the original Trustee, and **U.S. BANK NATIONAL ASSOCIATION** was the original Beneficiary under that certain Deed of Trust dated 06/07/2023, in the amount of $2,400,000.00, and recorded in **KING** County, **WASHINGTON**, under **Auditor File # 20230608000103**.

UNIT 3504, THE EMERALD, VOL. 315, P. 11-61, KING COUNTY
Parcel ID #: 232971-2510, 232971-2510-03

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**, as Trustee under said Deed of Trust and as Trustee, having received from the present Beneficiary under said Deed of Trust a written request to reconvey, reciting that the obligation(s) secured by the Deed of Trust have been fully satisfied, does hereby grant, bargain, sell and reconvey, unto the parties entitled thereto all right, title and interest which was heretofore acquired by said Trustee under said Deed of Trust.

**Dated this 26th day of January in the year 2024**
**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**

**By:** ______________________
**Charyce D. Harper**
**OFFICER**

STATE OF KENTUCKY
COUNTY OF DAVIESS
This foregoing instrument was acknowledged before me on this 26th day of January in the year 2024 by Charyce D. Harper as OFFICER of U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION. He/she/they is (are) personally known to me.

______________________
Derek Burnett
Notary Public - STATE OF KENTUCKY
Commission expires: 04/29/2027

OFFICIAL SEAL
DEREK BURNETT
NOTARY PUBLIC - KENTUCKY
STATE-AT-LARGE
My Comm. Expires 04/29/2027
Commission # KYNP70011

USRPD 440084109 T262401-11:53:52 [C-1] RCNWA14

*D0104325338*

# EXHIBIT 9

°Lk

**Return To:** U.S. Bank National Association, Attn: Centralized Image Capture CN-KY-MSMI
800 Moreland Street
Owensboro, KY 423012046

**Assessor's Parcel or Account Number:** 232971-2510
**Abbreviated Legal Description:**

**Prepared By:** Kyleisha Cherrise Joseph-Sutton
9380 Excelsior Blvd
Hopkins, MN 55343
**Full legal description located on page:** 4
**Grantor(s):** The Five Star Legacy
**Grantee(s):** U.S. Bank National Association
**Trustee:** U.S. Bank Trust Company, National Association
**Lender:** U.S. Bank National Association

QH-10602

# Deed of Trust

**Definitions.** Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

**Parties**

**(A)** *"Borrower"* is ALEXANDRA LOZANO, AS TRUSTEE OF THE FIVE STAR LEGACY TRUST DATED APRIL 25, 2023. Borrower currently residing at 121 Stewart St, Seattle, WA 98101. Borrower is the trustor under this Security Instrument.

**(B)** *"Lender"* is U.S. Bank National Association. Lender is a national bank organized and existing under the laws of the United States of America. Lender's address is 2800 Tamarack Road, Owensboro,

KY 42301. Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

**(C)** *"Trustee"* is U.S. Bank Trust Company, National Association. Trustee's address is 111 SW Fifth Avenue, Portland, OR 97204. The term "Trustee" includes any substitute/successor Trustee.

**Documents**

**(D)** *"Note"* means the promissory note dated March 25, 2025, and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender Two million three hundred eighty thousand and 00/100 Dollars (U.S. $2,380,000.00) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than April 1, 2055.

**(E)** *"Riders"* means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☒ Condominium Rider | ☐ MERS Rider |
| ☐ 1-4 Family Rider | ☐ Planned Unit Development Rider | ☒ Other(s) [specify] Trust Rider |
| ☐ Second Home Rider | ☐ VA Rider | |

**(F)** *"Security Instrument"* means this document, which is dated March 25, 2025, together with all Riders to this document.

**Additional Definitions**

**(G)** *"Applicable Law"* means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(H)** *"Community Association Dues, Fees, and Assessments"* means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association, or similar organization.

**(I)** *"Default"* means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).

**(J)** *"Electronic Fund Transfer"* means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to

debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

**(K)** *"Electronic Signature"* means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

**(L)** *"E-SIGN"* means the Electronic Signatures in Global and National Commerce Act (15 *U.S.C.* § 7001 et seq.), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**(M)** *"Escrow Items"* means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

**(N)** *"Loan"* means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(O)** *"Loan Servicer"* means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

**(P)** *"Miscellaneous Proceeds"* means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(Q)** *"Mortgage Insurance"* means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

**(R)** *"Partial Payment"* means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

**(S)** *"Periodic Payment"* means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

**(T)** *"Property"* means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."

**(U)** *"Rents"* means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.

(V) *"RESPA"* means the Real Estate Settlement Procedures Act (12 *U.S.C.* § 2601 et seq.) and its implementing regulation, Regulation X (12 *C.F.R.* Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(W) *"Successor in Interest of Borrower"* means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

(X) *"UETA"* means the *Uniform Electronic Transactions Act*, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**Transfer of Rights in the Property.** This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of King:

See Attached Schedule A

Parcel ID Number(s): 232971-2510

which currently has the address of 121 Stewart St, Seattle, Washington 98101 (*"Property Address"*);

TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, royalties, mineral rights, oil or gas rights or profits, water rights, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific Washington state requirements to constitute a uniform security instrument covering real property.

**Uniform Covenants.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and

late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

## 2. Acceptance and Application of Payments or Proceeds.

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

**(c) Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

**(d) No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

## 3. Funds for Escrow Items.

**(a) Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow Items (the *"Funds"*). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

**(b) Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver, Borrower must pay directly, when and where payable, the amounts due for any Escrow Items subject to the waiver. If Lender has waived the requirement to pay Lender the Funds for any or all Escrow Items, Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly pursuant to a waiver, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

**(c) Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**(d) Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items unless prohibited by Applicable Law. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the *"Required Actions"*). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

**(a) Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

**(b) Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower

secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(c) Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee.

**(d) Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(e) Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property,

to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**7. Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Subject to Applicable Law, Lender may make reasonable entries upon and inspections of the Property and/or may inspect the interior of the improvements on the Property.

**8. Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**

**(a) Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or

(iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs, and other fees and costs associated with the enforcement of this Security Instrument, including but not limited to foreclosure trustee and sheriff's fees and costs; (B) property inspection and valuation fees, unless prohibited by Applicable Law; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

**(b) Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

**(c) Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(d) Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

**10. Assignment of Rents.**

**(a) Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party (*"Tenant"*), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. Borrower authorizes Lender to collect the Rents, and agrees that each Tenant will pay the Rents to Lender. However, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

**(b) Notice of Default.** If Lender gives notice of Default to Borrower: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by

TO\

the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

(c) **Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

(d) **Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

(e) **No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

(f) **Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

(g) **Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

**11. Mortgage Insurance.**

(a) **Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

**(b) Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 *U.S.C.* § 4901 et seq.), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter (*"HPA"*). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

## 12. Assignment and Application of Miscellaneous Proceeds Forfeiture.

**(a) Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

**(b) Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(c) Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a *"Partial Devaluation"*) where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

**(d) Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. *"Opposing Party"* means the third party that owes Borrower the Miscellaneous

Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

**(e) Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights such as dower and curtesy and any available homestead exemptions; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**1 . Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and

(ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

**(b) Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other related fees.

**(c) Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

**(d) Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**1 . Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

**(a) Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(b) Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication (*"Electronic Communication"*) if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address (*"Electronic Address"*); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed

to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

**(c) Borrower's Notice Address.** The address to which Lender will send Borrower notice (*"Notice Address"*) will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

**(d) Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(e) Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**1 . Governing Law Severability Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of Washington. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to *"Section"* in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**1 . Borrower s Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Ha ardous Substances.**

**(a) Definitions.** As used in this Section 24: (i) *"Environmental Law"* means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) *"Hazardous Substances"* include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) *"Environmental Cleanup"* includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an *"Environmental Condition"* means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**(b) Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**(c) Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

2 . **Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower (*"Borrower's Electronic Signature"*) instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

2 . **Acceleration; Remedies.**

**(a) Notification of Default.** Lender will give a notification of Default to Borrower prior to acceleration following Borrower's Default, except that such notification of Default will not be sent when Lender exercises its right under Section 19 unless Applicable Law provides otherwise. The notification will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notification is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notification may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction; (v) Borrower's right to reinstate after acceleration or commencement of the foreclosure in accordance with Applicable law; and (vi) any other matters required to be included in the notification by Applicable Law.

**(b) Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notification, Lender, and in accordance with Applicable Law, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs, and other fees and costs associated with the enforcement of this Security Instrument, including but not limited to, foreclosure trustee's and sheriff's fees and costs, and title costs; (ii) property inspection and valuation fees; and (iii) any other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument unless prohibited by Applicable Law.

**(c) Foreclosure Notices; Sale of Property.** If Lender invokes the power of sale, Lender will send notice to Trustee of the occurrence of an event of Default and of Lender's election to cause the Property to be sold. Trustee and/or Lender will take such action regarding any required notices and will give such notices to Borrower and to other recipients as Applicable Law may require. At a time permitted in accordance with Applicable Law, and after publication of the notice of sale, Trustee, without further demand on Borrower, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

**(d) Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed will be prima facie evidence of the truth of the statements made in that deed. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs; (ii) to all sums secured by this Security Instrument; and (iii) the surplus, if any, less the clerk's filing fee, shall be deposited, together with all documents required under Applicable Law, with the clerk of the superior court of the county in which the sale took place.

**2 . Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender will request Trustee to reconvey the Property and will surrender this Security Instrument and all Notes evidencing the debt secured by this Security Instrument to Trustee. Upon such request, Trustee will reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons will pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**2 . Substitute Trustee.** In accordance with Applicable Law, Lender may, from time to time, by itself or through the Loan Servicer, or any other authorized representative, appoint a successor trustee to any Trustee appointed under this Security Instrument who has ceased to act. Without conveyance of the Property, the successor trustee will succeed to all the rights, title, power, and duties conferred upon Trustee in this Security Instrument and by Applicable Law.

**29. Use of Property.** The Property is not used principally for agricultural purposes.

**30. Attorneys Fees.** Lender will be entitled to recover in any action or proceeding to construe or enforce any term of this Security Instrument (a) its reasonable attorneys' fees and costs, and (b) any other fees and costs associated with the enforcement of this Security Instrument, including but not limited to, foreclosure trustee and sheriff's fees and costs and title costs. The term "attorneys' fees," whenever used in this Security Instrument, includes without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

**Borrower**

**Alexandra Lozano**
*Trustee of the The Five Star Legacy, under trust instrument dated April 25, 2023*

**Acknowledgment**

State of Washington

County of King

This record was acknowledged before me on March 25, 2025 by Alexandra Lozano as trustee of The Five Star Legacy under trust instrument dated April 25, 2023 on behalf of the Trust.

*Notary Public*

Janet Arroyo
*Notary Public Name*

My Commission Expires: June 22, 2027

This notarial act was completed:
☒ In Person
☐ In Person Electronic
☐ Remote Using Communication Technology

Loan Origination Organization: U.S. Bank National Association

NMLS ID: 402761

Loan Originator: Brent Joseph Cahill

NMLS ID: 227423

## Exhibit A

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF KING, STATE OF WASHINGTON, AND IS DESCRIBED AS FOLLOWS:

UNIT 3504, THE EMERALD, A CONDOMINIUM, ACCORDING TO DECLARATION THEREOF RECORDED UNDER KING COUNTY RECORDING NO. 20201208002087, AND ANY AMENDMENTS THERETO; SAID UNIT IS LOCATED ON SURVEY MAP AND PLANS FILED IN VOLUME 315 OF CONDOMINIUMS, PAGE(S) 11 THROUGH 61, IN KING COUNTY, WASHINGTON.

Parcel ID: 232971-2510

Commonly known as 121 Stewart Street, Unit 3504, Seattle, WA 98101
However, by showing this address no additional coverage is provided

ABBREVIATED LEGAL: UNIT 3504, THE EMERALD, VOL. 315, P. 11-61, KING COUNTY.

# Condominium Rider

THIS CONDOMINIUM RIDER is made this 25th day of March, 2025, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the *"Security Instrument"*) of the same date given by the undersigned (the *"Borrower"*) to secure Borrower's Note to U.S. Bank National Association (the *"Lender"*) of the same date and covering the Property described in the Security Instrument and located at:

121 Stewart St, Seattle, WA 98101

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

The Emerald Condominium

[Name of Condominium Project]

(the *"Condominium Project"*). If the owners association or other entity which acts for the Condominium Project (the *"Owners Association"*) holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds, and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower will perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The *"Constituent Documents"* are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower will promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance, then (i) Lender waives the provision in Section 3 for the portion of the Periodic Payment made to Lender consisting of the yearly premium installments for property insurance on the Property, and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower will give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and will be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower will take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and will be paid to Lender. Such proceeds will be applied by Lender to the sums secured by the Security Instrument as provided in Section 12.

**E. Lender's Prior Consent.** Borrower will not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents unless the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F will become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts will bear interest from the date of disbursement at the Note rate and will be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

**Borrower**

**Alexandra Lozano**
*Trustee of the The Five Star Legacy, under trust instrument dated April 25, 2023*

[redacted]Y

# Inter Vivos Revocable Trust Rider

**Definitions Used in this Rider.**

**(A)** ***"Revocable Trust."*** The The Five Star Legacy created under trust instrument dated April 25, 2023.

**(B)** ***"Revocable Trust Trustee(s)."*** Alexandra Lozano , trustee(s) of the Revocable Trust.

**(C)** ***"Revocable Trust Settlor(s)."*** Alexandra Lozano, settlor(s), grantor(s), or trustor(s) of the Revocable Trust.

**(D)** ***"Lender."*** U.S. Bank National Association

**(E)** ***"Security Instrument."*** The *Deed of Trust*, *Mortgage* or *Security Deed* and any riders thereto of the same date as this Rider given to secure the Note to Lender of the same date made by the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s) and any other natural persons signing such Note and covering the Property (as defined below).

**(F)** ***"Property."*** The property described in the Security Instrument and located at: 121 Stewart St, Seattle, WA 98101 [Property Address].

**THIS INTER VIVOS REVOCABLE TRUST RIDER** is made March 25, 2025, and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

**Additional Covenants.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), and the Revocable Trust Settlor(s) and the Lender further covenant and agree as follows:

**A. Inter Vivos Revocable Trust.**

**1. Certification and Warranties of Revocable Trust Trustee(s).** The Revocable Trust Trustee(s) certify to Lender that the Revocable Trust is an inter vivos revocable trust for which the Revocable Trust Trustee(s) are holding full title to the Property as trustee(s).

The Revocable Trust Trustee(s) warrants to Lender that (i) the Revocable Trust is validly created under the laws of the State of Washington; (ii) the trust instrument creating the Revocable Trust is in full force and effect and there are no amendments or other modifications to the trust instrument affecting the revocability of the Revocable Trust; (iii) the Property is located in the State of Washington; (iv) the Revocable Trust Trustee(s) have full power and authority as trustee(s) under the trust instrument creating the Revocable Trust and under applicable law to execute the Security Instrument, including this Rider; (v) the Revocable Trust Trustee(s) have executed the Security Instrument, including this Rider, on behalf of the Revocable Trust; (vi) the Revocable Trust Settlor(s) have executed the Security Instrument, including this Rider, acknowledging all of the terms and conditions contained therein and agreeing to be bound thereby; (vii) only the Revocable Trust Settlor(s) and the Revocable Trust Trustee(s) may hold any power of direction over the Revocable Trust; (viii) only the Revocable Trust Settlor(s) hold the power to direct the


© 2018 Wolters Kluwer Financial Services, Inc.
All rights reserved.

Trustee(s) in the management of the Property; (ix) only the Revocable Trust Settlor(s) hold the power of revocation over the Revocable Trust; and (x) the Revocable Trust Trustee(s) have not been notified of the existence or assertion of any lien, encumbrance or claim against any beneficial interest in, or transfer of all or any portion of any beneficial interest in or powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust, as the case may be, or power of revocation over the Revocable Trust.

**2. NOTICE OF CHANGES TO RE□OCABLE TRUST AND TRANSFER OF PO□ ERS O□ER RE□OCABLE TRUST TRUSTEE(S) OR RE□OCABLE TRUST OR BOTH□ NOTICE OF CHANGE OF RE□OCABLE TRUST TRUSTEE(S)□NOTICE OF CHANGE OF OCCUPANC□ OF THE PROPERT□□NOTICE OF TRANSFER OF BENEFICIAL INTEREST IN RE□OCABLE TRUST.** The Revocable Trust Trustee(s) shall provide timely notice to Lender promptly upon notice or knowledge of any revocation or termination of the Revocable Trust, or of any change in the holders of the powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust, as the case may be, or of any change in the holders of the power of revocation over the Revocable Trust, or both, or of any change in the trustee(s) of the Revocable Trust (whether such change is temporary or permanent), or of any change in the occupancy of the Property, or of any sale, transfer, assignment or other disposition (whether by operation of law or otherwise) of any beneficial interest in the Revocable Trust.

**B. Additional Borrower(s).** The term *"Borrower"* when used in the Security Instrument shall refer to the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s), jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as *"Borrower"* on the first page of the Security Instrument, each covenant and agreement and undertaking of *"Borrower"* in the Security Instrument shall be such party's covenant and agreement and undertaking as *"Borrower"* and shall be enforceable by Lender as if such party were named as *"Borrower"* in the Security Instrument.

**C. Transfer of the Property or a Beneficial Interest in the Revocable Trust.** The Revocable Trust Party/Parties acknowledge and agree that the prohibitions and covenants of the Transfer of the Property or a Beneficial Interest in Borrower section in the Security Instrument expressly includes but is not limited to a sale, transfer, assignment or other disposition of any beneficial interest in the Living Trust.


□ 2018 Wolters Kluwer Financial Services, Inc.
All rights reserved.

## Signatures

BY SIGNING BELOW, the Revocable Trust Trustee(s) accepts and agrees to the terms and covenants contained in this Inter Vivos Revocable Trust Rider.

**Trustee**

Alexandra Lozano 3/25/25

**Alexandra Lozano , Trustee of the The Five Star Legacy, under trust instrument dated April 25, 2023** — **Date**

BY SIGNING BELOW, the undersigned Revocable Trust Settlor(s) acknowledges all of the terms and covenants contained in this Inter Vivos Revocable Trust Rider and agrees to be bound thereby.

**Settlors**

Alexandra Lozano 3/25/25

**Alexandra Lozano** — **Date**


© 2018 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# EXHIBIT 10

°Lk

**Return To:** U.S. Bank National Association, Attn: Centralized Image Capture CN-KY-MSMI
800 Moreland Street
Owensboro, KY 423012046

**Assessor's Parcel or Account Number:** 232971-2510
**Abbreviated Legal Description:**

**Prepared By:** Kyleisha Cherrise Joseph-Sutton
9380 Excelsior Blvd
Hopkins, MN 55343
**Full legal description located on page:** 4
**Grantor(s):** The Five Star Legacy
**Grantee(s):** U.S. Bank National Association
**Trustee:** U.S. Bank Trust Company, National Association
**Lender:** U.S. Bank National Association

GH-10602

# Deed of Trust

***This mortgage is being re recorded to add the Arm Rder**

**Definitions.** Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

**Parties**

**(A)** *"Borrower"* is ALEXANDRA LOZANO, AS TRUSTEE OF THE FIVE STAR LEGACY TRUST DATED APRIL 25, 2023. Borrower currently residing at 121 Stewart St, Seattle, WA 98101. Borrower is the trustor under this Security Instrument.

**(B)** *"Lender"* is U.S. Bank National Association. Lender is a national bank organized and existing under the laws of the United States of America. Lender's address is 2800 Tamarack Road, Owensboro,

KY 42301. Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

**(C)** *"Trustee"* is U.S. Bank Trust Company, National Association. Trustee's address is 111 SW Fifth Avenue, Portland, OR 97204. The term "Trustee" includes any substitute/successor Trustee.

**Documents**

**(D)** *"Note"* means the promissory note dated March 25, 2025, and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender Two million three hundred eighty thousand and 00/100 Dollars (U.S. $2,380,000.00) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than April 1, 2055.

**(E)** *"Riders"* means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☒ Condominium Rider | ☐ MERS Rider |
| ☐ 1-4 Family Rider | ☐ Planned Unit Development Rider | ☒ Other(s) [specify] Trust Rider |
| ☐ Second Home Rider | ☐ VA Rider | |

**(F)** *"Security Instrument"* means this document, which is dated March 25, 2025, together with all Riders to this document.

**Additional Definitions**

**(G)** *"Applicable Law"* means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(H)** *"Community Association Dues, Fees, and Assessments"* means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association, or similar organization.

**(I)** *"Default"* means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).

**(J)** *"Electronic Fund Transfer"* means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to

äLL●K

debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

**(K)** *"Electronic Signature"* means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

**(L)** *"E-SIGN"* means the Electronic Signatures in Global and National Commerce Act (15 *U.S.C.* § 7001 et seq.), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**(M)** *"Escrow Items"* means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

**(N)** *"Loan"* means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(O)** *"Loan Servicer"* means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

**(P)** *"Miscellaneous Proceeds"* means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(Q)** *"Mortgage Insurance"* means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

**(R)** *"Partial Payment"* means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

**(S)** *"Periodic Payment"* means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

**(T)** *"Property"* means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."

**(U)** *"Rents"* means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.

(V) *"RESPA"* means the Real Estate Settlement Procedures Act (12 *U.S.C.* § 2601 et seq.) and its implementing regulation, Regulation X (12 *C.F.R.* Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(W) *"Successor in Interest of Borrower"* means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

(X) *"UETA"* means the *Uniform Electronic Transactions Act*, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**Transfer of Rights in the Property.** This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of King:

See Attached Schedule A

Parcel ID Number(s): 232971-2510

which currently has the address of 121 Stewart St, Seattle, Washington 98101 (*"Property Address"*);

TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, royalties, mineral rights, oil or gas rights or profits, water rights, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific Washington state requirements to constitute a uniform security instrument covering real property.

**Uniform Covenants.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and

late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

## 2. Acceptance and Application of Payments or Proceeds.

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

**(c) Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

**(d) No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.**

**(a) Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow Items (the *"Funds"*). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

**(b) Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver, Borrower must pay directly, when and where payable, the amounts due for any Escrow Items subject to the waiver. If Lender has waived the requirement to pay Lender the Funds for any or all Escrow Items, Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly pursuant to a waiver, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

**(c) Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**(d) Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items unless prohibited by Applicable Law. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the *"Required Actions"*). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

**(a) Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

**(b) Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower

secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(c) Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee.

**(d) Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(e) Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property,

to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**7. Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Subject to Applicable Law, Lender may make reasonable entries upon and inspections of the Property and/or may inspect the interior of the improvements on the Property.

**8. Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**

**(a) Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or

(iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs, and other fees and costs associated with the enforcement of this Security Instrument, including but not limited to foreclosure trustee and sheriff's fees and costs; (B) property inspection and valuation fees, unless prohibited by Applicable Law; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

**(b) Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

**(c) Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(d) Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

## 10. Assignment of Rents.

**(a) Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party ("*Tenant*"), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. Borrower authorizes Lender to collect the Rents, and agrees that each Tenant will pay the Rents to Lender. However, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

**(b) Notice of Default.** If Lender gives notice of Default to Borrower: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by

TO\

the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

(c) **Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

(d) **Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

(e) **No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

(f) **Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

(g) **Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

**11. Mortgage Insurance.**

(a) **Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

**(b) Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 *U.S.C.* § 4901 et seq.), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter (*"HPA"*). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

## 12. Assignment and Application of Miscellaneous Proceeds; Forfeiture.

**(a) Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

**(b) Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(c) Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a *"Partial Devaluation"*) where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

**(d) Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. *"Opposing Party"* means the third party that owes Borrower the Miscellaneous

Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

**(e) Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released Forbearance by Lender Not a aiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. oint and Several Liability Signatories Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights such as dower and curtesy and any available homestead exemptions; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**1 . Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and

(ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

**(b) Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other related fees.

**(c) Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

**(d) Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**1 . Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

**(a) Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(b) Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication (*"Electronic Communication"*) if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address (*"Electronic Address"*); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed

to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

**(c) Borrower's Notice Address.** The address to which Lender will send Borrower notice (*"Notice Address"*) will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

**(d) Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(e) Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**1 . Governing Law Severability Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of Washington. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to *"Section"* in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**1 . Borrower s Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

**(a) Definitions.** As used in this Section 24: (i) *"Environmental Law"* means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) *"Hazardous Substances"* include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) *"Environmental Cleanup"* includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an *"Environmental Condition"* means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**(b) Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**(c) Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**2 . Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower ("*Borrower's Electronic Signature*") instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**2 . Acceleration; Remedies.**

**(a) Notification of Default.** Lender will give a notification of Default to Borrower prior to acceleration following Borrower's Default, except that such notification of Default will not be sent when Lender exercises its right under Section 19 unless Applicable Law provides otherwise. The notification will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notification is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notification may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction; (v) Borrower's right to reinstate after acceleration or commencement of the foreclosure in accordance with Applicable law; and (vi) any other matters required to be included in the notification by Applicable Law.

**(b) Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notification, Lender, and in accordance with Applicable Law, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs, and other fees and costs associated with the enforcement of this Security Instrument, including but not limited to, foreclosure trustee's and sheriff's fees and costs, and title costs; (ii) property inspection and valuation fees; and (iii) any other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument unless prohibited by Applicable Law.

**(c) Foreclosure Notices; Sale of Property.** If Lender invokes the power of sale, Lender will send notice to Trustee of the occurrence of an event of Default and of Lender's election to cause the Property to be sold. Trustee and/or Lender will take such action regarding any required notices and will give such notices to Borrower and to other recipients as Applicable Law may require. At a time permitted in accordance with Applicable Law, and after publication of the notice of sale, Trustee, without further demand on Borrower, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

**(d) Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed will be prima facie evidence of the truth of the statements made in that deed. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs; (ii) to all sums secured by this Security Instrument; and (iii) the surplus, if any, less the clerk's filing fee, shall be deposited, together with all documents required under Applicable Law, with the clerk of the superior court of the county in which the sale took place.

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender will request Trustee to reconvey the Property and will surrender this Security Instrument and all Notes evidencing the debt secured by this Security Instrument to Trustee. Upon such request, Trustee will reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons will pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**28. Substitute Trustee.** In accordance with Applicable Law, Lender may, from time to time, by itself or through the Loan Servicer, or any other authorized representative, appoint a successor trustee to any Trustee appointed under this Security Instrument who has ceased to act. Without conveyance of the Property, the successor trustee will succeed to all the rights, title, power, and duties conferred upon Trustee in this Security Instrument and by Applicable Law.

**29. Use of Property.** The Property is not used principally for agricultural purposes.

**30. Attorneys Fees.** Lender will be entitled to recover in any action or proceeding to construe or enforce any term of this Security Instrument (a) its reasonable attorneys' fees and costs, and (b) any other fees and costs associated with the enforcement of this Security Instrument, including but not limited to, foreclosure trustee and sheriff's fees and costs and title costs. The term "attorneys' fees," whenever used in this Security Instrument, includes without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

**Borrower**

Alexandra Lozano
**Alexandra Lozano**
*Trustee of the The Five Star Legacy, under trust instrument dated April 25, 2023*

**Acknowledgment**

State of Washington

County of King

This record was acknowledged before me on March 25, 2025
by Alexandra Lozano as trustee of
The Five Star Legacy
under trust instrument dated April 25, 2023 on behalf of the Trust.

*Notary Public*

Janet Arroyo
*Notary Public Name*

My Commission Expires:
June 22, 2027

This notarial act was completed:
☒ In Person
☐ In Person Electronic
☐ Remote Using Communication Technology

Loan Origination Organization: U.S. Bank National Association

NMLS ID: 402761

Loan Originator: Brent Joseph Cahill

NMLS ID: 227423

# Exhibit A

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF KING, STATE OF WASHINGTON, AND IS DESCRIBED AS FOLLOWS:

UNIT 3504, THE EMERALD, A CONDOMINIUM, ACCORDING TO DECLARATION THEREOF RECORDED UNDER KING COUNTY RECORDING NO. 20201208002087, AND ANY AMENDMENTS THERETO; SAID UNIT IS LOCATED ON SURVEY MAP AND PLANS FILED IN VOLUME 315 OF CONDOMINIUMS, PAGE(S) 11 THROUGH 61, IN KING COUNTY, WASHINGTON.

Parcel ID: 232971-2510

Commonly known as 121 Stewart Street, Unit 3504, Seattle, WA 98101
However, by showing this address no additional coverage is provided

ABBREVIATED LEGAL: UNIT 3504, THE EMERALD, VOL. 315, P. 11-61, KING COUNTY.

# Condominium Rider

THIS CONDOMINIUM RIDER is made this 25th day of March, 2025, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the *"Security Instrument"*) of the same date given by the undersigned (the *"Borrower"*) to secure Borrower's Note to U.S. Bank National Association (the *"Lender"*) of the same date and covering the Property described in the Security Instrument and located at:

121 Stewart St, Seattle, WA 98101

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

The Emerald Condominium

[Name of Condominium Project]

(the *"Condominium Project"*). If the owners association or other entity which acts for the Condominium Project (the *"Owners Association"*) holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds, and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower will perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The *"Constituent Documents"* are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower will promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance, then (i) Lender waives the provision in Section 3 for the portion of the Periodic Payment made to Lender consisting of the yearly premium installments for property insurance on the Property, and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower will give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and will be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower will take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and will be paid to Lender. Such proceeds will be applied by Lender to the sums secured by the Security Instrument as provided in Section 12.

**E. Lender's Prior Consent.** Borrower will not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents unless the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F will become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts will bear interest from the date of disbursement at the Note rate and will be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

**Borrower**

**Alexandra Lozano**
*Trustee of the The Five Star Legacy, under trust instrument dated April 25, 2023*

■⊕Y

# Inter □ivos Revocable Trust Rider

**Definitions Used in this Rider.**

**(A)** ***"Revocable Trust."*** The The Five Star Legacy created under trust instrument dated April 25, 2023.

**(B)** ***"Revocable Trust Trustee(s)."*** Alexandra Lozano , trustee(s) of the Revocable Trust.

**(C)** ***"Revocable Trust Settlor(s)."*** Alexandra Lozano, settlor(s), grantor(s), or trustor(s) of the Revocable Trust.

**(D)** ***"Lender."*** U.S. Bank National Association

**(E)** ***"Security Instrument."*** The *Deed of Trust*, *Mortgage* or *Security Deed* and any riders thereto of the same date as this Rider given to secure the Note to Lender of the same date made by the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s) and any other natural persons signing such Note and covering the Property (as defined below).

**(F)** ***"Property."*** The property described in the Security Instrument and located at: 121 Stewart St, Seattle, WA 98101 [Property Address].

**THIS INTER VIVOS REVOCABLE TRUST RIDER** is made March 25, 2025, and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

**Additional Covenants.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), and the Revocable Trust Settlor(s) and the Lender further covenant and agree as follows:

**A. Inter □ivos Revocable Trust.**

**1. Certification and □arranties of Revocable Trust Trustee(s).** The Revocable Trust Trustee(s) certify to Lender that the Revocable Trust is an inter vivos revocable trust for which the Revocable Trust Trustee(s) are holding full title to the Property as trustee(s).

The Revocable Trust Trustee(s) warrants to Lender that (i) the Revocable Trust is validly created under the laws of the State of Washington; (ii) the trust instrument creating the Revocable Trust is in full force and effect and there are no amendments or other modifications to the trust instrument affecting the revocability of the Revocable Trust; (iii) the Property is located in the State of Washington; (iv) the Revocable Trust Trustee(s) have full power and authority as trustee(s) under the trust instrument creating the Revocable Trust and under applicable law to execute the Security Instrument, including this Rider; (v) the Revocable Trust Trustee(s) have executed the Security Instrument, including this Rider, on behalf of the Revocable Trust; (vi) the Revocable Trust Settlor(s) have executed the Security Instrument, including this Rider, acknowledging all of the terms and conditions contained therein and agreeing to be bound thereby; (vii) only the Revocable Trust Settlor(s) and the Revocable Trust Trustee(s) may hold any power of direction over the Revocable Trust; (viii) only the Revocable Trust Settlor(s) hold the power to direct the


□ 2018 Wolters Kluwer Financial Services, Inc.
All rights reserved.

Trustee(s) in the management of the Property; (ix) only the Revocable Trust Settlor(s) hold the power of revocation over the Revocable Trust; and (x) the Revocable Trust Trustee(s) have not been notified of the existence or assertion of any lien, encumbrance or claim against any beneficial interest in, or transfer of all or any portion of any beneficial interest in or powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust, as the case may be, or power of revocation over the Revocable Trust.

**2. NOTICE OF CHANGES TO RE□OCABLE TRUST AND TRANSFER OF PO□ ERS O□ER RE□OCABLE TRUST TRUSTEE(S) OR RE□OCABLE TRUST OR BOTH□ NOTICE OF CHANGE OF RE□OCABLE TRUST TRUSTEE(S)□NOTICE OF CHANGE OF OCCUPANC□ OF THE PROPERT□□NOTICE OF TRANSFER OF BENEFICIAL INTEREST IN RE□OCABLE TRUST.** The Revocable Trust Trustee(s) shall provide timely notice to Lender promptly upon notice or knowledge of any revocation or termination of the Revocable Trust, or of any change in the holders of the powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust, as the case may be, or of any change in the holders of the power of revocation over the Revocable Trust, or both, or of any change in the trustee(s) of the Revocable Trust (whether such change is temporary or permanent), or of any change in the occupancy of the Property, or of any sale, transfer, assignment or other disposition (whether by operation of law or otherwise) of any beneficial interest in the Revocable Trust.

**B. Additional Borrower(s).** The term *"Borrower"* when used in the Security Instrument shall refer to the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s), jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as *"Borrower"* on the first page of the Security Instrument, each covenant and agreement and undertaking of *"Borrower"* in the Security Instrument shall be such party's covenant and agreement and undertaking as *"Borrower"* and shall be enforceable by Lender as if such party were named as *"Borrower"* in the Security Instrument.

**C. Transfer of the Property or a Beneficial Interest in the Revocable Trust.** The Revocable Trust Party/Parties acknowledge and agree that the prohibitions and covenants of the Transfer of the Property or a Beneficial Interest in Borrower section in the Security Instrument expressly includes but is not limited to a sale, transfer, assignment or other disposition of any beneficial interest in the Living Trust.

## Signatures

BY SIGNING BELOW, the Revocable Trust Trustee(s) accepts and agrees to the terms and covenants contained in this Inter Vivos Revocable Trust Rider.

**Trustee**

Alexandra Lozano, Trustee of the The Five Star Legacy, under trust instrument dated April 25, 2023 — 3/25/25
Date

BY SIGNING BELOW, the undersigned Revocable Trust Settlor(s) acknowledges all of the terms and covenants contained in this Inter Vivos Revocable Trust Rider and agrees to be bound thereby.

**Settlors**

Alexandra Lozano — 3/25/25
Date


© 2018 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Rider□Ad□ustable Rate

## One □ear Treasury Inde□ □Rate Caps

THIS ADJUSTABLE RATE RIDER is made this 25th day of March, 2025, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the *"Security Instrument"*) of the same date given by the undersigned (the *"Borrower"*) to secure Borrower's Adjustable Rate Note (the *"Note"*) to U.S. Bank National Association (the *"Lender"*) of the same date and covering the property described in the Security Instrument and located at:

121 Stewart St, Seattle, WA 98101
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.**

**Additional Covenants.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Interest Rate and Monthly Payment Changes.** The Note provides for monthly payments of interest and a portion of the principal (*"Monthly Payment"*) and an initial interest rate of 6.375%. The Note provides for changes in the interest rate and the Monthly Payments as follows:

**4. Interest Rate and Monthly Payment Changes.**

**(A) Change Dates.** The interest rate I will pay may change on the 1st day of April, 2032, and on the 1st day of the month every year thereafter. Each date on which my interest rate could change is called a *"Change Date."*

**(B) The Inde□.** Beginning with the first Change Date, my interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the *"Administrator"*). The *"Index"* is a benchmark, known as the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year index. The Index is currently available by the Board of Governors of the Federal Reserve System. The most recent Index value available as of the date 45 days before each Change Date is called the *"Current Index,"* provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.


□ 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

**(C) Calculation of Changes.** Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three quarters percentage points (2.75%) (the *"Margin"*) to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will then round the result of the Margin plus the Current Index to the nearest zero and one eighth percentage point (.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the Monthly Payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my Monthly Payment.

**(D) Limits on Interest Rate Changes.** The interest rate I am required to pay at the first Change Date will not be greater than 11.375% or less than 2.75%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2%) from the rate of interest I have been paying for the preceding year, and will never be greater than 11.375% or less than 2.75%.

**(E) Effective Date of Changes.** My new interest rate will become effective on each Change Date. I will pay the amount of my new Monthly Payment beginning on the first Monthly Payment date after the Change Date until the amount of my Monthly Payment changes again.

**(F) Notice of Changes.** The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my Monthly Payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Inde□ and Replacement Margin.** The Index is deemed to be no longer available and will be replaced if any of the following events (each, a *"Replacement Event"*) occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the *"Replacement Index"*) and may also select a new margin (the *"Replacement Margin"*), as follows:

1. If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.
2. If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a


□ 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and Monthly Payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**B. Transfer of the Property or a Beneficial Interest in Borrower.**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 19 of the Security Instrument will read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 19 of the Security Instrument described in Section B1 above will then cease to be in effect, and the provisions of Section 19 of the Security Instrument will be amended to read as follows:


□ 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law. Lender also will not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises this option to require immediate payment in full, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.


□ 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

**Borrower**

**Alexandra Lozano**
*Trustee of the The Five Star Legacy, under trust instrument dated April 25, 2023*


© 2022 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# EXHIBIT 11

King County

SEP 25

HOME / ... / PROPERTY TAX STOREFRONT

# Property Taxes

Pay your real property or personal property tax bills

**King County recently switched to a new payment system. Online payments are subject to a service fee.**

King County does not receive any portion of this fee. The fees may vary based on the chosen payment method.

- eCheck ($0.55 flat fee)
- Credit, Debit cards and PayPal (2.35%, $2.00 fee minimum)
- International Credit cards (3.95%, $2.00 fee minimum)

## Enter tax account or parcel number

Note: Please do not include dashes

Account or Parcel Search

SEARCH

232971251003 ✕

Clear all ✕

## Tax payer name: FIVE STAR LEGACY TRUST

Tax account # 232971251003

### Account Summary

Parcel Number
2329712510

Tax Account Status
This account is active.

Mailing Address

500 ELLIOT WEST #404
SEATTLE WA 98119
Pay by mail

## Billing Details

DELINQUENT FIRST HALF 2026 AND PRIOR YEAR(S) AMOUNT DUE IF PAID OR POSTMARKED BY SEPTEMBER 30, 2026.

Current Year:

Choose a Payment Amount

| | | |
|---|---|---|
| 2026 1st Half | $10,432.67 | ADD TO CART |
| 2026 2nd Half | $9,704.82 | ADD TO CART |

Prior Year Delinquent Tax:

| | | |
|---|---|---|
| 2025 | $11,837.88 | ADD TO CART |

## Breakdown by Tax Year

| Tax Information | 2026 | 2025 | 2024 | 2023 |
|---|---|---|---|---|
| Levy code | 0011 | 0011 | 0011 | 0011 |
| Status | Taxable | Taxable | Taxable | Taxable |
| Omit year | 0000 | 0000 | 0000 | 0000 |
| Land value | $77,300 | $77,300 | $77,300 | $67,600 |
| Improvement value | $1,878,700 | $2,298,700 | $2,351,700 | $3,211,400 |
| Charges | | | | |
| Tax | $19,380.93 | $21,845.37 | $21,989.03 | $26,621.87 |
| Surface Water | $7.35 | $6.84 | $6.34 | $5.96 |
| Noxious Weed | $8.00 | $6.20 | $6.20 | $6.20 |
| Conservation | $13.37 | $13.03 | $12.79 | $12.47 |
| Total billed | $19,409.65 | $21,871.44 | $22,014.36 | $26,646.50 |
| Amount paid | $0.00 | $10,935.72 | $22,014.36 | $26,646.50 |
| *Interest* | *$727.84* | *$902.16* | *$0.00* | *$0.00* |

| Tax Information | 2026 | 2025 | 2024 | 2023 |
|---|---|---|---|---|
| *Penalty* | *$0.00* | *$0.00* | *$0.00* | *$0.00* |
| **Balance** | **$20,137.49** | **$11,837.88** | **$0.00** | **$0.00** |

## Payment History

| Date | Receipt | Amount | Penalty/Interest Paid |
|---|---|---|---|
| 04/09/2025 | 103720 | $23,830.49 | $1,816.13 |
| 04/03/2025 | 172810 | $10,935.72 | $0.00 |
| 09/12/2023 | 628475 | $13,323.25 | $0.00 |
| 04/18/2023 | 634747 | $13,323.25 | $0.00 |

## 2026 Tax / Fee Distribution

| Distribution information | Dollars | Percent * |
|---|---|---|
| State School Part One | $2,858.78 | 14.7% |
| State School Two - McCleary | $1,541.43 | 7.9% |
| Local School | $4,211.41 | 21.7% |
| County | $2,848.75 | 14.7% |
| City | $5,900.80 | 30.4% |
| Road | $0.00 | 0.0% |
| Port | $193.20 | 1.0% |
| Sound Transit | $310.35 | 1.6% |
| Fire | $0.00 | 0.0% |
| Hospital | $0.00 | 0.0% |
| Flood | $184.24 | 0.9% |
| Library | $0.00 | 0.0% |
| EMS | $490.92 | 2.5% |
| Other | $841.05 | 4.3% |
| Fees And Charges | $28.72 | 0.1% |

***Percents are rounded***

## 2026 Tax / Fee Distribution Chart

**Current Year Property Tax Distribution**




## Request a Tax Statement

To request a tax statement, click the **Request tax statement** button below. The statement will be mailed to the address on file within 10 working days.

REQUEST TAX STATEMENT

If the name or mailing address on your statement is incorrect, visit the Property Tax FAQ - General/Statements and scroll down to the section titled, [How do I change my mailing address or the name on my statement?]

Cart

Total $0.00

PROCEED TO CHECKOUT

## Treasury Operations

### Location

King Street Center
201 South Jackson Street #710 Seattle, WA 98104

### Hours

Monday through Friday
8:30 AM to 4:30 PM

Phone

206-263-2890
TTY Relay: 711

## Customer Service

### Property Tax Information and Customer Service

206-263-2890
PropertyTax.CustomerService@kingcounty.gov

### Mobile Homes/Commercial Personal Property

206-263-2844
Treasury.PersonalProperty@kingcounty.gov

### Maintenance Assessment Management Systems Local Improvement Districts

206-263-1893
mams.lid@kingcounty.gov

### Tax Foreclosures

206-263-2649
TaxForeclosures@kingcounty.gov

INDEX A B C D E F G H I J K L M N O P Q R S T U V W X Y Z



© King County, WA 2026

# EXHIBIT 12

King County

SEP 25

HOME / ... / PROPERTY TAX STOREFRONT

# Property Taxes

Pay your real property or personal property tax bills

**King County recently switched to a new payment system. Online payments are subject to a service fee.**

King County does not receive any portion of this fee. The fees may vary based on the chosen payment method.

- eCheck ($0.55 flat fee)
- Credit, Debit cards and PayPal (2.35%, $2.00 fee minimum)
- International Credit cards (3.95%, $2.00 fee minimum)

## Enter tax account or parcel number

Note: Please do not include dashes

Account or Parcel Search
2591780120

SEARCH

259178012003 ✕

Clear all ✕

## Tax payer name: LOZANO ALEXANDRA & LOZANO-P

Tax account # 259178012003

### Account Summary

Parcel Number
2591780120

Tax Account Status
This account is active.

Mailing Address

20511 SE 261ST PLACE
COVINGTON WA 98042
Pay by mail

## Billing Details

DELINQUENT FIRST HALF 2026 AND PRIOR YEAR(S) AMOUNT DUE IF PAID OR POSTMARKED BY SEPTEMBER 30, 2026.

Current Year:

Choose a Payment Amount

| | | |
|---|---|---|
| 2026 1st Half | $4,127.04 | ADD TO CART |
| 2026 2nd Half | $3,840.61 | ADD TO CART |

Prior Year Delinquent Tax:

| | | |
|---|---|---|
| 2025 | $3,759.02 | ADD TO CART |

## Breakdown by Tax Year

## Payment History

## 2026 Tax / Fee Distribution

## 2026 Tax / Fee Distribution Chart

## Request a Tax Statement

Cart

Total $0.00

PROCEED TO CHECKOUT

Treasury Operations

### Location

King Street Center
201 South Jackson Street #710 Seattle, WA 98104

### Hours

Monday through Friday
8:30 AM to 4:30 PM

### Phone

206-263-2890
TTY Relay: 711

## Customer Service

### Property Tax Information and Customer Service

206-263-2890
PropertyTax.CustomerService@kingcounty.gov

### Mobile Homes/Commercial Personal Property

206-263-2844
Treasury.PersonalProperty@kingcounty.gov

### Maintenance Assessment Management Systems Local Improvement Districts

206-263-1893
mams.lid@kingcounty.gov

### Tax Foreclosures

206-263-2649
TaxForeclosures@kingcounty.gov

INDEX A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

Terms of use
Privacy
Data transparency
Contact us
Directory
Elected officials
Customer service

Departments
Office locations
Holidays and closures
Employee resources
Jobs

Accessibility

© King County, WA 2026

# EXHIBIT 13

# Voter Information Lookup

Please find your voter registration information below.

Full Name:
**ALEXANDRA LOZANO**

Street Address:
**1415 SE 38TH AVE**

City:
**OCALA**

Zip Code:
**34471**

County Name:
**MARION**

Voter Identification Number:
**133983044**

Date Of Registration:
**10/15/2025**

Party:
**No Party Affiliation**

Voter Status:
**Active***

* An active voter means the person is registered to vote. The deadline to register to be eligible to vote in an upcoming election is 29 days before that election.

Access Ballot and Precinct Information available through your county Supervisor of Elections' (https://dos.fl.gov/elections/for-voters/check-your-voter-status-and-polling-place/voter-precinct-lookup/) website.

New Search (/en/CheckVoterStatus)

Please email BVRSHelp@dos.fl.gov (mailto:BVRSHelp@dos.fl.gov) for website assistance.

**Ron DeSantis, Governor**
**Cord Byrd, Secretary of State**

Privacy Policy (http://dos.fl.gov/privacy-policy/)
| Accessibility (http://dos.fl.gov/accessibility/)
| Site Map (http://dos.fl.gov/site-map/)
| Communications (http://dos.fl.gov/communications/)
| Connect (http://dos.fl.gov/communications/connect/)

## Questions or comments? Contact Us (mailto:BVRSHelp@dos.fl.gov)

Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing.

Copyright (http://dos.myflorida.com/copyright/) © 2026 State of Florida, Florida Department of State.

## Florida Department of State

R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399-0250

**Voter Assistance Hotline:** 1.866.308.6739
**Hours:** Monday - Friday 8:00 AM - 5:00 PM (Eastern Time)
If hearing or speech impaired, please contact the Division using the **Florida Relay Service** (https://www.ftri.org/relay), 1.800.955.8771 (TTY) or 1.800.955.8770 (Voice) or 1-800-955-1339 (ASCII), or 1.877.955.8773 (español a español ).

# EXHIBIT 14

**Parcel ID Search for Parcel ID "259178-0120", Document Types "", Begin Date "1/1/1976", and End Date "9/25/2026" | Total Records "16" | Verified Through Date "06/05/2026 (20260608000090)."**

| # | Status | Parcel ID | Grantor | Grantee | Record Date Search | Doc Type | Book Type | Book | Page | Rec. # | DocLinks | Legal | Lot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | V | 2591780120 (King County) | HULTQUIST HOMES INC | MAROSI NICHOLAS P MAROSI TONI M | 06/30/2004 | WARRANTY DEED | NONE | | 0000 | 20040630001066 | 2051079 | 259178-0120 PARCELID: 2591780120 | legal |
| 2 | V | 2591780120 (King County) | MAROSI NICHOLAS P MAROSI TONI M | SUNTRUST MORTGAGE INC | 06/30/2004 | DEED OF TRUST | NONE | | 0000 | 20040630001067 | | LT 12 VOLUME 213 OF PLATS PAGE 61 259178-0120 PARCELID: 2591780120 LOT: 12 | legal |
| 3 | V | 2591780120 (King County) | MAROSI NICHOLAS P MAROSI TONI M | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC | 08/12/2005 | DEED OF TRUST | NONE | | 0000 | 20050812000407 | | LT 12 FOREST CREST ESTATES 259178-0120 PARCELID: 2591780120 LOT: 12 | legal |
| 4 | V | 2591780120 (King County) | MAROSI NICHOLAS P MAROSI TONI M | SCHOOL EMPLOYEES CREDIT UNION OF WASHINGTON | 10/27/2005 | DEED OF TRUST | NONE | | 0000 | 20051027000380 | | LT 12 FOREST CREST ESTATES 259178-0120 PARCELID: 2591780120 LOT: 12 | legal |
| 5 | V | 2591780120 (King County) | MAROSI NICHOLAS P MAROSI TONI M | WASHINGTON FEDERAL SAVINGS | 04/28/2008 | DEED OF TRUST | NONE | | 0000 | 20080428001961 | | FOREST CREST ESTATES 259178-0120 PARCELID: 2591780120 SUB: FOR | legal |
| 6 | V | 2591780120 (King County) | MAROSI NICHOLAS P | HATTRUP PETER J HATTRUP HEATHER | 03/26/2019 | WARRANTY DEED | NONE | | 0000 | 20190326000824 | 2979195 | PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |
| 7 | V | 2591780120 (King County) | HATTRUP PETER J HATTRUP HEATHER | FINANCE OF AMERICA MORTGAGE LLC FIDELITY NATIONAL TITLE COMPANY OF WASHINGTON ... | 03/26/2019 | DEED OF TRUST | NONE | | 0000 | 20190326000825 | | PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |

| # | Status | Parcel ID | Grantor | Grantee | Record Date Search | Doc Type | Book Type | Book | Page | Rec. # | DocLinks | Legal | Lot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | V | 2591780120 (King County) | HATTRUP PETER HATTRUP HEATHER | FINANCE OF AMERICA MORTGAGE LLC MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC ... | 03/06/2020 | DEED OF TRUST | NONE | | 0000 | 20200306000607 | | PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |
| 9 | V | 2591780120 (King County) | HATTRUP PETER HATTRUP HEATHER | 1ST SECURITY BANK OF WASHINGTON | 03/05/2021 | UCC FILING | NONE | | 0000 | 20210305001693 | | PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |
| 10 | V | 259178-0120 (King County) | HATTRUP PETER HATTRUP HEATHER ... | NATIONWIDE TITLE CLEARING NATIONWIDE TITLE CLEARING LLC | 01/18/2022 | APPOINTMENT OF SUCCESSOR TRUST | NONE | | 0000 | 20220118001830 | 20200306000607 | PID: QTR: SEC: TWP: RGE: LOT: BLK: PBK: SUB: PID: 259178-0120 QTR: SEC: TWP: RGE: LOT: BLK: PBK: SUB: | legal |
| 11 | V | 259178-0120 (King County) | NATIONWIDE TITLE CLEARING NATIONWIDE TITLE CLEARING LLC | HATTRUP PETER HATTRUP HEATHER ... | 01/18/2022 | FULL RECONVEYANCE | NONE | | 0000 | 20220118001831 | 20200306000607 | PID: QTR: SEC: TWP: RGE: LOT: BLK: PBK: SUB: PID: 259178-0120 QTR: SEC: TWP: RGE: LOT: BLK: PBK: SUB: | legal |
| 12 | V | 259178-0120 2591780120 (King County) | HATTRUP PETER J HATTRUP HEATHER ... | NATIONSTAR MORTGAGE LLC MR COOPER ... | 01/19/2022 | DEED OF TRUST | NONE | | 0000 | 20220119000331 | | PID: 259178-0120 PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |

| # | Status | Parcel ID | Grantor | Grantee | Record Date Search | Doc Type | Book Type | Book | Page | Rec. # | DocLinks | Legal | Lot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | V | 259178-0120 2591780120 (King County) | HATTRUP PETER J HATTRUP HEATHER ... | NATIONSTAR MORTGAGE LLC MR COOPER ... | 01/19/2022 | DEED OF TRUST | NONE | | 0000 | 20220119000331 | | PID: 259178-0120 PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |
| 14 | V | 2591780120 (King County) | HATTRUP PETER HATTRUP HEATHER | LOZANO ALEXANDRA LOZANO-PEREA MAGALY | 07/21/2023 | WARRANTY DEED | NONE | | 0000 | 20230721000355 | 3246667 | PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |
| 15 | V | 2591780120 (King County) | LOZANO ALEXANDRA LORENZO-PEREA MAGALY | U S BANK NA U S BANK TRUST CO | 07/21/2023 | DEED OF TRUST | NONE | | 0000 | 20230721000356 | | PID: QTR: SEC: TWP: RGE: LOT: BLK: PBK: SUB: PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 LOT: BLK: PBK: SUB: FOREST CREST ESTATES | legal |
| 16 | V | 2591780120 (King County) | LOZANO KENNEDY ALEXANDRA MAGALYT LOZANO PEREA | MEJIA SANCHEZ ERIKA ALEJANDRA | 07/23/2026 | LIS PENDENS | NONE | | 0000 | 20260723000029 | | PID: 2591780120 QTR: NE SEC: 29 TWP: 22 RGE: 6 SUB: FOREST CREST ESTATES | legal |

**End of Results**

# EXHIBIT 15

New Search | Property Tax Bill | Map This Property | Glossary of Terms | Area Report | Print Property Detail

## PARCEL DATA

| | |
|---|---|
| Parcel | 259178-0120 |
| Name | LOZANO ALEXANDRA & LOZANO-P |
| Site Address | 20511 SE 261ST PL 98042 |
| Residential Area | 086-002 (SE Appraisal District) |
| Property Name | Single Family Residence |

| | |
|---|---|
| Jurisdiction | COVINGTON |
| Levy Code | 1064 |
| Property Type | R |
| Plat Block / Building Number | |
| Plat Lot / Unit Number | 12 |
| Quarter-Section-Township-Range | NE-29-22-6 |

**Legal Description**

FOREST CREST ESTATES
**PLat Block:**
**Plat Lot:** 12

## LAND DATA

| | |
|---|---|
| Highest & Best Use As If Vacant | SINGLE FAMILY |
| Highest & Best Use As Improved | PRESENT USE |
| Present Use | Single Family(Res Use/Zone) |
| Land SqFt | 7,646 |
| Acres | 0.18 |

| | |
|---|---|
| Percentage Unusable | |
| Unbuildable | NO |
| Restrictive Size Shape | NO |
| Zoning | R4 |
| Water | WATER DISTRICT |
| Sewer/Septic | PUBLIC |
| Road Access | PUBLIC |
| Parking | ADEQUATE |
| Street Surface | PAVED |

**Views**

| | |
|---|---|
| Rainier | |
| Territorial | |
| Olympics | |
| Cascades | |
| Seattle Skyline | |
| Puget Sound | |
| Lake Washington | |
| Lake Sammamish | |
| Lake/River/Creek | |
| Other View | |

**Waterfront**

| | |
|---|---|
| Waterfront Location | |
| Waterfront Footage | 0 |
| Lot Depth Factor | 0 |
| Waterfront Bank | |
| Tide/Shore | |
| Waterfront Restricted Access | |
| Waterfront Access Rights | NO |
| Poor Quality | NO |
| Proximity Influence | NO |

**Designations**

| | |
|---|---|
| Historic Site | |
| Current Use | (none) |
| Nbr Bldg Sites | |
| Adjacent to Golf Fairway | NO |
| Adjacent to Greenbelt | NO |
| Other Designation | NO |
| Deed Restrictions | NO |
| Development Rights Purchased | NO |
| Easements | NO |
| Native Growth Protection Easement | NO |
| DNR Lease | NO |

**Nuisances**

| | |
|---|---|
| Topography | |
| Traffic Noise | |
| Airport Noise | |
| Power Lines | NO |
| Other Nuisances | NO |

**Problems**

| | |
|---|---|
| Water Problems | NO |
| Transportation Concurrency | NO |
| Other Problems | NO |

**Environmental**

| | |
|---|---|
| Environmental | NO |

## BUILDING

| | |
|---|---|
| Building Number | 1 |
| Year Built | 2004 |
| Year Renovated | 0 |
| Stories | 2 |
| Living Units | 1 |
| Grade | 8 Good |
| Grade Variant | 0 |
| Condition | Average |
| Basement Grade | |

| | |
|---|---|
| 1st Floor | 1,740 |
| 1/2 Floor | 0 |
| 2nd Floor | 960 |
| Upper Floor | 0 |
| Finished Basement | 0 |
| Total Finished Area | 2,700 |
| Total Basement | 0 |
| Basement Garage | 0 |
| Unfinished 1/2 | 0 |
| Unfinished Full | 0 |
| AGLA | 2,700 |
| Attached Garage | 740 |
| Bedrooms | 4 |
| Full Baths | 2 |
| 3/4 Baths | 0 |
| 1/2 Baths | 1 |
| Heat Source | Gas |
| Heat System | Forced Air |
| Deck Area SqFt | 0 |
| Open Porch SqFt | 0 |
| Enclosed Porch SqFt | 0 |
| Brick/Stone | 0 |
| Fireplace Single Story | 1 |
| Fireplace Muilti Story | 0 |
| Fireplace Free Standing | 0 |
| Fireplace Additional | 0 |
| AddnlCost | 0 |
| Obsolescence | 0 |
| Net Condition | 0 |
| Percentage Complete | 0 |
| Daylight Basement | |
| View Utilization | |

Picture of Building 1



Floor plan of Building 1




## TAX ROLL HISTORY

| Account | Valued Year | Tax Year | Omit Year | Levy Code | Appraised Land Value ($) | Appraised Imps Value ($) | Appraised Total Value ($) | New Dollars ($) | Taxable Land Value ($) | Taxable Imps Value ($) | Taxable Total Value ($) | Tax Value Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 259178012003 | 2026 | 2027 | | 1064 | 340,000 | 385,000 | 725,000 | 0 | 340,000 | 385,000 | 725,000 | |
| 259178012003 | 2025 | 2026 | | 1064 | 307,000 | 392,000 | 699,000 | 0 | 307,000 | 392,000 | 699,000 | |
| 259178012003 | 2024 | 2025 | | 1064 | 296,000 | 376,000 | 672,000 | 0 | 296,000 | 376,000 | 672,000 | |
| 259178012003 | 2023 | 2024 | | 1064 | 265,000 | 338,000 | 603,000 | 0 | 265,000 | 338,000 | 603,000 | |
| 259178012003 | 2022 | 2023 | | 1064 | 293,000 | 372,000 | 665,000 | 0 | 293,000 | 372,000 | 665,000 | |
| 259178012003 | 2021 | 2022 | | 1064 | 250,000 | 287,000 | 537,000 | 0 | 250,000 | 287,000 | 537,000 | |
| 259178012003 | 2020 | 2021 | | 1064 | 149,000 | 383,000 | 532,000 | 0 | 149,000 | 383,000 | 532,000 | |
| 259178012003 | 2019 | 2020 | | 1064 | 141,000 | 361,000 | 502,000 | 0 | 141,000 | 361,000 | 502,000 | |
| 259178012003 | 2018 | 2019 | | 1064 | 140,000 | 361,000 | 501,000 | 0 | 140,000 | 361,000 | 501,000 | |
| 259178012003 | 2017 | 2018 | | 1064 | 127,000 | 323,000 | 450,000 | 0 | 127,000 | 323,000 | 450,000 | |
| 259178012003 | 2016 | 2017 | | 1064 | 116,000 | 277,000 | 393,000 | 0 | 116,000 | 277,000 | 393,000 | |
| 259178012003 | 2015 | 2016 | | 1064 | 105,000 | 254,000 | 359,000 | 0 | 105,000 | 254,000 | 359,000 | |
| 259178012003 | 2014 | 2015 | | 1064 | 105,000 | 222,000 | 327,000 | 0 | 105,000 | 222,000 | 327,000 | |
| 259178012003 | 2013 | 2014 | | 1064 | 84,000 | 189,000 | 273,000 | 0 | 84,000 | 189,000 | 273,000 | |
| 259178012003 | 2012 | 2013 | | 1064 | 79,000 | 175,000 | 254,000 | 0 | 79,000 | 175,000 | 254,000 | |
| 259178012003 | 2011 | 2012 | | 1064 | 91,000 | 194,000 | 285,000 | 0 | 91,000 | 194,000 | 285,000 | |
| 259178012003 | 2010 | 2011 | | 1064 | 102,000 | 218,000 | 320,000 | 0 | 102,000 | 218,000 | 320,000 | |
| 259178012003 | 2009 | 2010 | | 1066 | 102,000 | 230,000 | 332,000 | 0 | 102,000 | 230,000 | 332,000 | |
| 259178012003 | 2008 | 2009 | | 1066 | 114,000 | 280,000 | 394,000 | 0 | 114,000 | 280,000 | 394,000 | |
| 259178012003 | 2007 | 2008 | | 1066 | 103,000 | 251,000 | 354,000 | 0 | 103,000 | 251,000 | 354,000 | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 259178012003 | 2006 | 2007 | | 1066 | 90,000 | 247,000 | 337,000 | 0 | 90,000 | 247,000 | 337,000 | |
| 259178012003 | 2005 | 2006 | | 1066 | 85,000 | 235,000 | 320,000 | 0 | 85,000 | 235,000 | 320,000 | |
| 259178012003 | 2004 | 2005 | | 1066 | 64,000 | 276,000 | 340,000 | 265,000 | 64,000 | 276,000 | 340,000 | |
| 259178012003 | 2003 | 2004 | | 1066 | 60,000 | 0 | 60,000 | 60,000 | 60,000 | 0 | 60,000 | |

## SALES HISTORY

| Excise Number | Recording Number | Document Date | Sale Price | Seller Name | Buyer Name | Instrument | Sale Reason |
|---|---|---|---|---|---|---|---|
| 3246667 | 20230721000355 | 7/12/2023 | $735,000.00 | HATTRUP PETER+HEATHER | LOZANO ALEXANDRA+LOZANO-PEREA MAGALY | Warranty Deed | None |
| 2979195 | 20190326000824 | 3/20/2019 | $455,000.00 | MAROSI NICHOLAS P | HATTRUP PETER J+HEATHER | Statutory Warranty Deed | None |
| 2051079 | 20040630001066 | 6/1/2004 | $321,450.00 | HULTQUIST HOMES INC | MAROSI NICHOLAS P+TONI M | Statutory Warranty Deed | None |
| 1971178 | 20030707003061 | 7/3/2003 | $1,530,000.00 | LAKERIDGE DEVELOPMENT INC | HULQUIEST HOMES INC | Statutory Warranty Deed | None |

## REVIEW HISTORY

## PERMIT HISTORY

| Permit Number | Permit Description | Type | Issue Date | Permit Value | Issuing Jurisdiction | Reviewed Date |
|---|---|---|---|---|---|---|
| B03-0286 | NSFR (New Single Family Res) | Building, New | 10/30/2003 | $263,321 | COVINGTON | 7/7/2004 |

## HOME IMPROVEMENT EXEMPTION

New Search | Property Tax Bill | Map This Property | Glossary of Terms | Area Report | Print Property Detail

### Reference Links:

- Residential Physical Inspection Areas
- King County Taxing Districts Codes and Levies (.PDF)
- King County Tax Links
- Property Tax Advisor
- Washington State Department of Revenue (External link)
- Washington State Board of Tax Appeals (External link)
- Board of Appeals/Equalization
- Districts Report
- iMap
- Recorder's Office

  Scanned images of surveys and other map documents

  Scanned images of plats
- Housing Availability Dashboard

**Notice mailing date: 07/30/2026**

# EXHIBIT 16

Criteria Map Results

Previous Next · **1** of **3** Checked **0** All · None · Page Return to Single Line Display 360 Property View at 1 per page

# 20511 SE 261st Place, Covington, WA 98042

## Listing

MLS#: **2527848**
Community: **Covington**
Bedrooms: **4** Bathrooms: **2.5**
School District: **Kent**
Potential Terms: **Cash Out, Conventional, FHA, VA**

Status: **Active (08/10/2026)**
Area: **320** CDA: **93**
SqFt: **2,700** Lot Size: **.176 ac/7,646 sf**

Listing Price: **$852,500**
Original LP: **$852,500**



1 / 39

Marketing Remarks

**Home was temporarily off the market to refresh the interior, install new sod, and bark in front and backyard. It's ready for you now! This home is waiting for you and is ideally situated in a sweet spot on this small cul-de-sac. Beautifully designed space offers comfort, a prime location, and functionality. 2,700 sq ft, with dramatic, soaring ceilings and expansive windows that fill the home with natural light, creating a bright, inviting ambiance. 4 spacious bedrooms (one on the main floor) and 2.5 bathrooms. The primary bedroom has an attached luxury 5-piece ensuite and a walk-in closet. You'll enjoy both a living room and a family room. Gorgeous gourmet kitchen made for entertaining with ample counter space and cupboards galore. Gas fireplace, Luxury vinyl plank flooring throughout the main floor, and carpeted upstairs. The beautiful backyard retreat is 7,646 sq ft, perfect for relaxing or hosting guests for a BBQ, and is fully fenced and tree-lined, offering privacy. It includes a hot tub. Three-car garage with a shop area, wired for a generator and/or air tools, and an extra storage shed off the garage. Sprinkler system front and back yard! Be sure to check out the walk-through tour attached to the NWMLS.**

Broker Remarks

**Was temporarily off the market as the seller just vacated and wants to freshen it up with professional cleaning, upstairs carpet cleaning, and landscaping. Extra storage shed through the garage and along the side of home. A must see! Motivated Seller. Please use Showing time! Now Vacant!**

Showing Info: **MLS Keybox, See Remarks, ShowingTime, Vacant**
Offers: **Seller intends to review offers upon receipt**

Directions: **GPS friendly!**

Broker/Brokerage Information

Broker: **Cindy Smalley (87728)**
Office: **Around the Clock, Inc.**
Firm Document Email: **info@aroundtheclockinc.com**
Compensation: **2.5%**
Tail Provision (Days): **180**

Broker Phone: **(206) 841-5321**
Office Phone: **(253) 852-3000**
Office Fax: **(253) 852-1417**
Compensation Comments:

Owner/Occupant Information

Owner Name: **Alexandra Lozano**
Owner Name 2: **Magaly Lozano Perea**
Owner City: **Covington, WA.** Occupant Type: **Vacant**

Occupant Name: **Vacant**
Owner Phone: **(206) 841-5321**
Phone to Show: **(206) 841-5321**

General Information

Property Type: **Single Family** Sub Type: **Residential** Tax ID: **2591780120**
Year Built: **2004** Effective Yr Built: **2004** Effective Yr Built Source: **Public Records**
County: **King** State: **Washington**
SqFt: **2,700** SqFt Finished: **2,700** SqFt Unfinished:
Garage SqFt: **740** Price/SqFt: **$315.74**
Total Dwelling SqFt: **2,700** Total Price/SqFt: **$315.74**
SqFt Source: **King County** Lot Size: **.176 ac/7,646 sf** Lot Size Source: **Public Records** Lot Dim:
Bedrooms: **4** Fireplaces: **1**
Fireplace Type(s): **Gas**
Bathrooms: **2.5** Full Bathrooms: **2** 3/4 Baths: Half Baths: **1**
Number of Bathtubs: **2** Number of Showers: **2**
Parking Type: **Garage-Attached** Total Parking: **6**
Total Covered Parking: **3** Total Uncovered Parking: **3**
Roof: **Composition** Basement: **None**
School District: **Kent** **School District Websites** List Date: **06/05/2026** Expir Date:
Elementary: **Jenkins Creek Elem** Junior High: **Cedar Heights Jnr Hi** Senior High: **Kentlake High**

Homeowner Association: **Yes** HOA Dues: **$50.00** HOA Dues Freq: **Monthly** Monthly Rent:
Home Owner Dues Include: **Road Maintenance**
Other Dues/Fees (see remarks): **No**
Community Features: **CCRs**

Accessory Dwelling Unit

Listing Information

| | L | M | U-2 | U-3 | U-4 | S | G |
|---|---|---|---|---|---|---|---|
| # Beds: | | 1 | 3 | | | | |
| Bath Full: | | | 2 | | | | |
| Bath 3/4: | | | | | | | |
| Bath 1/2: | | 1 | | | | | |
| Fireplaces: | | 1 | | | | | |

Potential Terms: **Cash Out, Conventional, FHA, VA**
Building Condition: **Good**
Building Info: **Built On Lot**
Senior Exemption: **No**
Leased Equipment: **None**
Short Term Rental: **No**
Architecture: **Contemporary**
Style Code: **12 - 2 Story**
Foundation: **See Remarks**
Exterior: **Cement/Concrete, Wood Products**
View: **Territorial**
Zone Jurisdiction: **City**
Lot Topography/Vegetation: **Fruit Trees, Garden Space, Level**

Lot Details: **Cul-de-sac, Curbs, Paved Street, Sidewalk**
Floor Covering: **Vinyl Plank**
Appliances:**Dishwasher(s), Dryer(s), Garbage Disposal, Microwave(s), Refrigerator(s), Stove(s)/Range(s), Washer(s)**
Interior Features: **Bath Off Primary, Ceiling Fan(s), Dining Room, Security System, Vaulted Ceilings, Walk-in Closet**
Site Features: **Fenced-Partially, Gas Available, High Speed Internet, Hot Tub/Spa, Patio, Shop**
Excluded Items: **No**
Staging: **See Remarks**

Additional Property Information

Annual Taxes: **$6,948.00**
Tax Year: **2025**
Seller Disclosure Statement: **Provided**
Preliminary Title Ordered: **Yes**
Title Company: **Equity Title and Escrow ONLY to avoid counter.**
Prohibit Blogging: **Yes**
Bank/RE Owned: **No**
Auction: **No**
Leased Land: **No**
Right of First Refusal: **No**
FIRPTA: **No**
Home Faces: **North**
Common Interest Cmty: **No**
Equitable Interest: **No**
New Construction: **No**
New Construction State:
Possession: **Closing**
Pool:
3rd Party Approval Required: **None**
Internet Advertising (Active): **Yes**
Display on nwmls.com:
Display on IDX (First Look):
Showings Allowed (First Look):

Utility Information

Transit Nearby: **Yes**
Transit Route:
Cable/TV Provider: **Comcast**
Internet Provider: **Xfinity**
Garbage Service Provider: **Republic**
Gas Company: **Puget Sound Energy**
Sewer: **Sewer Connected**
Sewer Company: **Soos Creek**
Water Source: **Public**
Water Company: **Soos Creek**
Energy Source: **Electric**
Power Company: **Puget Sound Energy**
Water Heater Type/Location: **Gas / Garage**
Heating: **Forced Air**
Cooling: **None**

Selling Information

Sale Type is one of 'MLS', 'For Sale By Owner or Other MLS', 'Seller Representation Agreement', 'For Rent By Owner or Other MLS', 'Landlord Representation Agreement'
State Or Province is 'Washington'
APN is '2591780120'
Status is not 'Incomplete'
Ordered by Status, Area, Current Price
Found 3 results in 0.02 seconds.



Home - Google Drive | To Do List 9-23-26 - Google | paperlesspost.com/manage | Editing: Party Invitation - Pa | You're invited to "Party Invit | Home - NWMLS Members | Matrix

https://www.matrix.nwmls.com/Matrix/Results.aspx?c=H4sIAAAAAAAEAItWMjE2MIHSUTICYkMgtoTgvNKcHAihZGiGzCWCUDIyBRpiANUFZwxiAuRzyg3ROLz08NTD69CNigUAsTRI7mQBAAA)

YouTube Translate Gmail Maps News My Meetings - Zoom ColturaDIG Team Sp... All Bookmarks

Back to MEMBER SITE | TransactionDesk | Financial Tools | IMS | SUPRA

NORTHWEST MULTIPLE LISTING SERVICE · MY MATRIX | SEARCH | ROSTER | REALIST | DOWN PAYMENT | SHOWINGTIME | INPUT | STATS | DATA PARTNERS · Hello, Matthew

SF · Include other criteria · Recent Searches

Criteria · Map · Results

Previous Next · 1-3 of 3 Checked 0 All · None · Page Display Single Line at 25 per page

| # | MLS | Stat | Type | Address | Area | City | State | List/Sell $ | CDA | Bds | Bths | SF | Stat Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2527848 | A | RESI | 20511 SE 261st Place | 320 | Covington | WA | $852,500 | 93 | 4 | 2.5 | 2,700 | 08/10/2026 |
| 2 | 1357576 | S | RESI | 20511 SE 261st Place | 320 | Covington | WA | $455,000 | 138 | 4 | 2.5 | 2,700 | 03/26/2019 |
| 3 | 2069387 | S | RESI | 20511 SE 261st Place | 320 | Covington | WA | $735,000 | 2 | 4 | 2.5 | 3,440 | 07/21/2023 |

Actions Refine Save Carts · Previous 1 Next

Criteria Email Print Share Link CMA Directions Export Schedule Showing

Sale Type is one of 'MLS', 'For Sale By Owner or Other MLS', 'Seller Representation Agreement', 'For Rent By Owner or Other MLS', 'Landlord Representation Agreement'
State Or Province is 'Washington'
APN is '2591780120'
Status is not 'Incomplete'
Ordered by Status, Area, Current Price
Found 3 results in 0.02 seconds.

# EXHIBIT 17

Criteria Map Results

Previous Next · **1** of **3** Checked **0** All · None · Page Return to Single Line Display 360 Property View at 1 per page

# 121 Stewart St Unit #3504, Seattle, WA 98121

## Listing

MLS#: **2502738**
Community: **Downtown**
Bedrooms: **3** Bathrooms: **3**
School District: **Seattle**
Potential Terms: **Cash Out, Conventional**

Status: **Active (04/10/2026)**
Area: **701** CDA: **168**
SqFt: **1,770**

Listing Price: **$2,600,000**
Original LP: **$2,700,000**



1 / 34 Surround yourself in total luxury and relaxation while enjoying ...

Marketing Remarks

**Remarkable meets Magnificent at "The Emerald" in Downtown Seattle! This is the epitome of elevating your life ~ Remarkable opulent style awaits you inside #3504 Penthouse Collections home ~ A Magnificently Brilliant Design on the Southwest corner; Floor-to-10-foot ceiling windows create a captivating atmosphere with unobstructed panoramic views of Elliot Bay, Mount Rainier, and the Olympic Mountains ~ 3 Bedrooms, each with walk-in closets, 3 Bathrooms w/bidets and heated seats~Primary 5 piece bath w/heated floors~Automatic Window Shades with controls built into the lighting switches for your convenience~Marble Countertops~Kitchen with Miele Appliances ~ AC~ Steps from the iconic Pike Place Market, and the water's edge~Surrounded by the City's best culinary/cultural destinations~The Emerald experience includes; Concierge~Elevators~Rooftop Retreats & Outdoor spaces, BBQ areas for you and guests offering amazing views~Fitness Center~ and even a special dog space for you and your pet and a collection of other amenities. Includes underground garage parking space.**

Broker Remarks

**Occupied. Please do not enter the condo without a confirmed showing appointment~ Please use showing time. The NWMLS keybox will be with the conceigere by 11:00 am 4/11/26. AGENTS: check in with the Concierge, who has my NWMLS keybox. Key fob takes you in the elevator to all the luxuries inside this swank spot! See Collection of Amenities in supplements. Garage parking included. Viewing appointment Required!**

Showing Info: **Appointment, MLS Keybox, See Remarks, ShowingTime**
Offers: **Seller intends to review offers upon receipt**

Directions: **GPS Friendly**

Broker/Brokerage Information

Broker: **Cindy Smalley (87728)**
Office: **Around the Clock, Inc.**
Firm Document Email: **info@aroundtheclockinc.com**
Compensation: **2.5%**
Tail Provision (Days): **180**
Broker Phone: **(206) 841-5321**
Office Phone: **(253) 852-3000**
Office Fax: **(253) 852-1417**
Compensation Comments:

Owner/Occupant Information

Owner Name: **Five Star Legacy Trust**
Owner Name 2: **Five Star Legacy Trust**
Owner City: **Seattle, Washington** Occupant Type: **Owner**
Manager Name: **Joe Majewski**
Occupant Name: **Five Star Legacy Trust**
Owner Phone: **(000) 000-0000**
Phone to Show: **(000) 000-0000**
Manager Phone: **(425) 686-0605**

General Information

Property Type: **Single Family** Sub Type: **Condominium** Dwelling Type: **Attached** Tax ID: **2329712510**
Project: **The Emerald**
Year Built: **2020** Effective Yr Built: **2020** Effective Yr Built Source: **Public Records**
County: **King** State: **Washington**
SqFt: **1,770** SqFt Finished: SqFt Unfinished:
Garage SqFt: Price/SqFt: **$1,468.93**
Total Dwelling SqFt: **1,770** Total Price/SqFt: **$1,468.93**
SqFt Source: **Public Records** Lot Size: Lot Size Source: **Public Records** Lot Dim:
Bedrooms: **3** Fireplaces:
Bathrooms: **3** Full Bathrooms: **3** 3/4 Baths: Half Baths:
Number of Bathtubs: **3** Number of Showers: **3**
Parking Type: **Common Garage** Total Parking: **1**
Total Covered Parking: **1** Total Uncovered Parking:
# of Parking Spaces: **1** Parking Space #(s): **P26**
Roof: **Built-Up** Basement:
School District: **Seattle** School District Websites List Date: **04/10/2026** Expir Date:
Elementary: **Buyer To Verify** Junior High: **Buyer To Verify** Senior High: **Buyer To Verify**

Homeowner Association: **Yes** HOA Dues: **$1,895.00** HOA Dues Freq: **Monthly** Monthly Rent:
Home Owner Dues Include: **Central Hot Water, Common Area Maintenance, Concierge, Earthquake Ins., Garbage, Natural Gas, See Remarks, Sewer, Water**
Other Dues/Fees (see remarks): **No**
Common Property Features: **Elevator, Exercise Room, Lobby Entrance, Rooftop Deck, See Remarks**
Pets Allowed: **Cats Only, Dogs Only, Subj to Restrictions**

Accessory Dwelling Unit

Condominium Information

# of Stories in Building: **39** # of Units in Complex: **262** # of Units in Building: **262** # of Access Stairs: **0**
Floor # of the Unit: **35** Co Op: **No** Window Coverings: **Automatic Control Shades** Approved by FHA: **Yes**
Remodeled/Updated: **Y**
Special Assessment/$: **N**
Owner Occupancy %: **80** Rental Cap: **Below Rental Cap (See Remarks)**

Listing Information

| | L | M | U-2 | U-3 | U-4 | S | G |
|---|---|---|---|---|---|---|---|
| # Beds: | | 3 | | | | | |

Association Contact: **JOE**
Association Phone: **(206) 200-6751**

| | |
|---|---|
| Bath Full: | 3 |
| Bath 3/4: | |
| Bath 1/2: | |
| Fireplaces: | |
| LivingRoom | X |
| DiningRoom | X |
| UtilityRoom | X |
| Primary Bedroom | X |
| Entry | X |

Potential Terms: **Cash Out, Conventional**
Senior Exemption: **No**
Architecture: **Contemporary**
Style Code: **30 - Condo (1 Level)**
Exterior: **Metal/Vinyl**
View: **Bay, City, Mountain, See Remarks, Sound, Territorial**
View From: **Unit, Rooftop Deck, See Remarks**
Lot Details: **Corner Lot, Curbs, Paved Street, Sidewalk**
Floor Covering: **Engineered Hardwood**
Appliances:**Dishwasher(s), Dryer(s), Microwave(s), Refrigerator(s), Stove(s)/Range(s), Washer(s)**
Unit Features: **End Unit, Insulated Windows, Jetted/Soaking Tub, Penthouse**

Additional Property Information

Annual Taxes: **$22,014.00**
Tax Year: **2025**
Seller Disclosure Statement: **Provided**
Preliminary Title Ordered: **Yes**
Title Company: **EQUITY Title and Escrow Only!**
Prohibit Blogging: **Yes**
Bank/RE Owned: **No**
Auction: **No**
Right of First Refusal: **No**
FIRPTA: **No**
Home Faces: **Southwest**
Common Interest Cmty: **No**
Equitable Interest: **No**
New Construction: **No**
New Construction State:
Possession: **Closing**
3rd Party Approval Required: **None**
Internet Advertising (Active): **Yes**
Display on nwmls.com:
Display on IDX (First Look):
Showings Allowed (First Look):

Utility Information

Transit Nearby: **Yes**
Transit Route:
Garbage Service Provider: **INCLUDED WITH DUES**
Gas Company:
Sewer:
Sewer Company: **INCLUDED WITH DUES**
Water Source:
Water Company: **INCLUDED WITH DUES**
Energy Source: **Electric, Natural Gas**
Power Company: **SEATTLE CITY LIGHT**
Water Heater Type/Location: **Boiler / Boiler Room**
Heating: **Forced Air, Heat Pump**
Cooling: **Central A/C**

Built Green Information

Green Certifications: **LEED™**
Built Green Rating:
LEED Cert Rating: **Silver**
NW Energy Star Cert. Rating:

Selling Information

Sale Type is one of 'MLS', 'For Sale By Owner or Other MLS', 'Seller Representation Agreement', 'For Rent By Owner or Other MLS', 'Landlord Representation Agreement'
State Or Province is 'Washington'
APN is '2329712510'
Status is not 'Incomplete'
Ordered by Status, Area, Current Price
Found 3 results in 0.02 seconds.

Home - Google Drive | To Do List 9-23-26 - Google | paperlesspost.com/manage | Editing: Party Invitation - Pa | You're invited to "Party Invi | Home - NWMLS Members | Matrix | Ask Gemini

https://www.matrix.nwmls.com/Matrix/Results.aspx?c=H4sIAAAAAAAEAItWMjE2MIHSUTIGYkMgtoTgvNKcHAihZGiGzCWCUDlyBRpiANUFZwxiAuRzyg2JKTUwMDA7vCQczEhFNzIWANFVg8hsAQAA

Relaunch to update

YouTube | Translate | Gmail | Maps | News | My Meetings - Zoom | ColturaDIG Team Sp... | All Bookmar

Back to MEMBER SITE | TransactionDesk | Financial Tools | IMS | SUPRA

NORTHWEST MULTIPLE LISTING SERVICE | MY MATRIX | SEARCH | ROSTER | REALIST | DOWN PAYMENT | SHOWINGTIME | INPUT | STATS | DATA PARTNERS

Hello, Matthew

SF

Include other criteria

Recent Searches

Criteria | Map | Results

Previous Next · 1-3 of 3 Checked 0 All · None · Page Display Single Line at 25 per page

| # | MLS | Stat | Type | Address | Area | City | State | List/Sell $ | CDA | Bds | Bths | SF | Stat Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2502738 | A | COND | 121 Stewart St #3504 | 701 | Seattle | WA | $2,600,000 | 168 | 3 | 3 | 1,770 | 04/10/2026 |
| 2 | 1948003 | S | COND | 121 Stewart St #3504 | 701 | Seattle | WA | $3,200,000 | 319 | 3 | 3 | 1,770 | 06/08/2023 |
| 3 | 2291178 | CA | COND | 121 Stewart St #3504 | 701 | Seattle | WA | $3,440,000 | 28 | 3 | 3 | 1,770 | 10/16/2024 |

Actions | Refine | Save | Carts

Previous 1 Next

Criteria | Email | Print | Share Link | CMA | Directions | Export | Schedule Showing

Sale Type is one of 'MLS', 'For Sale By Owner or Other MLS', 'Seller Representation Agreement', 'For Rent By Owner or Other MLS', 'Landlord Representation Agreement'
State Or Province is 'Washington'
APN is '2329712510'
Status is not 'Incomplete'
Ordered by Status, Area, Current Price
Found 3 results in 0.08 seconds.

Matrix

Authorized users only. All information contained herein is copyright © 2026 NWMLS. All rights reserved. DMCA Copyright Notice.
Matrix v12.7. Copyright © 2026 Cotality. All rights reserved. Terms of Use.

cotality

# EXHIBIT 18

New Search | Property Tax Bill | Map This Property | Glossary of Terms | Area Report | Print Property Detail

## PARCEL DATA

| | |
|---|---|
| **Parcel** | 232971-2510 |
| **Name** | FIVE STAR LEGACY TRUST |
| **Site Address** | 121 STEWART ST # 3504 98101 |
| **Geo Area** | 30-100 |
| **Spec Area** | 700-5 |
| **Property Name** | EMERALD THE |

| | |
|---|---|
| **Jurisdiction** | SEATTLE |
| **Levy Code** | 0011 |
| **Property Type** | K |
| **Plat Block / Building Number** | |
| **Plat Lot / Unit Number** | UNIT 3504 |
| **Quarter-Section-Township-Range** | NE-31-25-4 |

**Legal Description**

EMERALD THE CONDOMINIUM PCT UND INT 0.71
**PLat Block:**
**Plat Lot:** UNIT 3504

## LAND DATA

Click the camera to see more pictures.



| | |
|---|---|
| **Highest & Best Use As If Vacant** | MIXED USE |
| **Highest & Best Use As Improved** | PRESENT USE |
| **Present Use** | Condominium(Mixed Use) |
| **Land SqFt** | 8,358 |
| **Acres** | 0.19 |

| | |
|---|---|
| **Percentage Unusable** | |
| **Unbuildable** | NO |
| **Restrictive Size Shape** | NO |
| **Zoning** | DMC 240/290-440 |
| **Water** | WATER DISTRICT |
| **Sewer/Septic** | PUBLIC |
| **Road Access** | PUBLIC |
| **Parking** | ADEQUATE |
| **Street Surface** | PAVED |

**Views**

| | |
|---|---|
| **Rainier** | |

**Waterfront**

| | |
|---|---|
| **Waterfront Location** | |

| | |
|---|---|
| Territorial | AVERAGE |
| Olympics | |
| Cascades | |
| Seattle Skyline | AVERAGE |
| Puget Sound | GOOD |
| Lake Washington | |
| Lake Sammamish | |
| Lake/River/Creek | |
| Other View | |

| | |
|---|---|
| Waterfront Footage | 0 |
| Lot Depth Factor | 0 |
| Waterfront Bank | |
| Tide/Shore | |
| Waterfront Restricted Access | |
| Waterfront Access Rights | NO |
| Poor Quality | NO |
| Proximity Influence | NO |

**Designations**

| | |
|---|---|
| Historic Site | |
| Current Use | (none) |
| Nbr Bldg Sites | |
| Adjacent to Golf Fairway | NO |
| Adjacent to Greenbelt | NO |
| Other Designation | NO |
| Deed Restrictions | NO |
| Development Rights Purchased | NO |
| Easements | NO |
| Native Growth Protection Easement | NO |
| DNR Lease | NO |

**Nuisances**

| | |
|---|---|
| Topography | |
| Traffic Noise | |
| Airport Noise | |
| Power Lines | NO |
| Other Nuisances | NO |

**Problems**

| | |
|---|---|
| Water Problems | NO |
| Transportation Concurrency | NO |
| Other Problems | NO |

**Environmental**

| | |
|---|---|
| Environmental | NO |

## BUILDING

**Apartment / Condo Complex Data**

| | |
|---|---|
| Complex Type | Mixed Res and Cml Condo |
| Complex Description | 2 Commercial + 262 Res Condo Units |
| Value Distribution Method | Pcnt Land Val |
| # of Bldgs | 1 |
| # of Stories | 40 |
| # of Units | 264 |
| Avg Unit Size | 939 |
| Land Per Unit | 31 |
| Project Location | ABOVE AVERAGE |
| Project Appeal | AVERAGE |
| % With View | 63 |
| Construction Class | STRUCTURAL STEEL |
| Building Quality | GOOD/EXCELLENT |
| Condition | Average |
| Year Built | 2021 |
| Eff Year | 2021 |
| % Complete | 100 |
| Elevators | Y |
| Security System | Y |
| FirePlace | N |
| Laundry | PRIVATE |
| Kitchens | Y |
| # of Meals | 0 |
| Founder's Fee | N |
| Apt Conversion | N |
| Condo Land Type | Fee Simple |

**+ Units in this condominium complex**

Condo Unit

| Unit | Minor | Building | Floor | Unit Year Built | Unit Eff Year | Unit type | Regression | Quality | Location | Condition |
|---|---|---|---|---|---|---|---|---|---|---|
| 3504 | 2510 | 01 | 35 | 2021 | 2021 | Flat | Include | Good | Excellent | Standard |

| Measurement | Size | Bed Room | 1/2 Bath | 3/4 Bath | Full Bath | Other Room | Fire Place | Top Floor | End Unit |
|---|---|---|---|---|---|---|---|---|---|
| SqFt | 1,770 | 3 | 0 | 0 | 3 | | N | N | Y |

| Parking Open | Carport | Parking Basement | Parking Basement Tandem | Parkage Garage | Parkage Garage Tandem | Parking Other |
|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | |

| View Mountain | View Lake/River | View City Territorial | View Puget Sound | View Lake WA / Lake Sammamish |
|---|---|---|---|---|
| Average | | Good | Excellent | |

## TAX ROLL HISTORY

| Account | Valued Year | Tax Year | Omit Year | Levy Code | Appraised Land Value ($) | Appraised Imps Value ($) | Appraised Total Value ($) | New Dollars ($) | Taxable Land Value ($) | Taxable Imps Value ($) | Taxable Total Value ($) | Tax Value Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 232971251003 | 2026 | 2027 | | 0011 | 38,600 | 1,780,400 | 1,819,000 | 0 | 38,600 | 1,780,400 | 1,819,000 | |
| 232971251003 | 2025 | 2026 | | 0011 | 77,300 | 1,878,700 | 1,956,000 | 0 | 77,300 | 1,878,700 | 1,956,000 | |
| 232971251003 | 2024 | 2025 | | 0011 | 77,300 | 2,298,700 | 2,376,000 | 0 | 77,300 | 2,298,700 | 2,376,000 | |
| 232971251003 | 2023 | 2024 | | 0011 | 77,300 | 2,351,700 | 2,429,000 | 0 | 77,300 | 2,351,700 | 2,429,000 | |
| 232971251003 | 2022 | 2023 | | 0011 | 67,600 | 3,211,400 | 3,279,000 | 0 | 67,600 | 3,211,400 | 3,279,000 | |
| 232971251003 | 2021 | 2022 | | 0011 | 67,600 | 2,276,400 | 2,344,000 | 1,382,584 | 67,600 | 2,276,400 | 2,344,000 | |
| 232971251003 | 2020 | 2021 | | 0011 | 70,179 | 893,716 | 963,895 | 0 | 70,179 | 893,716 | 963,895 | |

## SALES HISTORY

| Excise Number | Recording Number | Document Date | Sale Price | Seller Name | Buyer Name | Instrument | Sale Reason |
|---|---|---|---|---|---|---|---|
| 3240627 | 20230608000102 | 5/31/2023 | $3,200,000.00 | 1613 SECOND AVENUE LLC | FIVE STAR LEGACY TRUST +LOZANO ALEXANDRA | Warranty Deed | None |

## REVIEW HISTORY

## PERMIT HISTORY

## HOME IMPROVEMENT EXEMPTION

New Search | Property Tax Bill | Map This Property | Glossary of Terms | Area Report | Print Property Detail

**Reference Links:**

- Residential Physical Inspection Areas
- King County Taxing Districts Codes and Levies (.PDF)
- King County Tax Links
- Property Tax Advisor
- Washington State Department of Revenue (External link)
- Washington State Board of Tax Appeals (External link)
- Board of Appeals/Equalization
- Districts Report
- iMap
- Recorder's Office

  Scanned images of surveys and other map documents

  Scanned images of plats
- Housing Availability Dashboard

**Notice mailing date: 07/23/2026**

# EXHIBIT 19

**Parcel ID Search for Parcel ID "232971-2510", Document Types "", Begin Date "1/1/1976", and End Date "9/25/2026" | Total Records "5" | Verified Through Date "06/05/2026 (20260608000090)."**

| # | Status | Parcel ID | Grantor | Grantee | Record Date Search | Doc Type | Book Type | Book | Page | Rec. # | DocLinks | Legal | Lot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | V | 2329712510 (King County) | 1613 SECOND AVENUE LLC | FIVE STAR LEGACY TRUST LOZANO ALEXANDRA | 06/08/2023 | WARRANTY DEED | NONE | | 0000 | 20230608000102 | 3240627 | PID: 2329712510 QTR: NE SEC: 31 TWP: 25 RGE: 4 SUB: EMERALD THE | legalfield_ |
| 2 | V | 2329712510 (King County) | FIVE STAR LEGACY TRUST | U S BANK NATIONAL ASSOCIATION U S BANK TRUST CO | 06/08/2023 | DEED OF TRUST | NONE | | 0000 | 20230608000103 | | PID: QTR: SEC: TWP: RGE: LOT: BLK: PBK: SUB: PID: 2329712510 QTR: NE SEC: 31 TWP: 25 RGE: 4 LOT: BLK: PBK: SUB: EMERALD THE | legalfield_ |
| 3 | V | 2329712510 (King County) | SCHLUCKEBIER AMBER T | US BANK NA | 08/02/2023 | AFFIDAVIT | NONE | | 0000 | 20230802000242 | 20230608000103 | PID: 2329712510 QTR: NE SEC: 31 TWP: 25 RGE: 4 SUB: EMERALD THE | legalfield_ |
| 4 | V | 2329712510 (King County) | LOZANO ALEXANDER FIVE STAR LEGACY TRUST | U S BANK NATIONAL ASSOCIATION U S BANK TRUST COMPANY NA | 04/30/2025 | DEED OF TRUST | NONE | | 0000 | 20250430000835 | | PID: 2329712510 QTR: NE SEC: 31 TWP: 25 RGE: 4 SUB: EMERALD THE | legalfield_ |
| 5 | V | 2329712510 (King County) | FIVE STAR LEGACY | U S BANK NATIONAL ASSOCIATION U S BANK TRUST CO | 07/29/2025 | DEED OF TRUST | NONE | | 0000 | 20250729000964 | | PID: 2329712510 QTR: NE SEC: 31 TWP: 25 RGE: 4 SUB: EMERALD THE | legalfield_ |

**End of Results**

# EXHIBIT 20

**Return Address:**
Vicente Omar Barraza
10728 16th Ave SW
Seattle, WA 98146

20260723000029
LIS PENDENS Rec: $306.50
7/23/2026 8:44 AM
KING COUNTY, WA

Please print or type information **WASHINGTON STATE RECORDER'S Cover Sheet** (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)

1. Notice of Lis Pendens 2. ______
3. ______ 4. ______

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page ______ of document

**Grantor(s)** Exactly as name(s) appear on document

1. Lozano Kennedy, Alexandra , ______
2. Magaly Lozano Perea , ______

Additional names on page ______ of document.

**Grantee(s)** Exactly as name(s) appear on document

1. Mejia Sanchez, Erika Alejandra, etc. et.al. , ______
2. ______ , ______

Additional names on page ______ of document.

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)
FOREST CREST ESTATES PLAT BLOCK: PLAT LOT: 12, COUNTY OF KING, STATE OF WA

Additional legal is on page _____ of document.

**Assessor's Property Tax Parcel/Account Number** ☐ Assessor Tax # not yet assigned
2591780120

The Auditor/Recorder will rely on the information provided on this form. The staff will not read the document to verify the accuracy or completeness of the indexing information provided herein.

**"I am signing below and paying an additional $50 recording fee (as provided in RCW 36.18.010 and referred to as an emergency nonstandard document), because this document does not meet margin and formatting requirements. Furthermore, I hereby understand that the recording process may cover up or otherwise obscure some part of the text of the original document as a result of this request."**

______ Signature of Requesting Party

**Note to submitter: Do not sign above nor pay additional $50 fee if the document meets margin/formatting requirements**

AFTER RECORDING RETURN TO:
Vicente Omar Barraza, WSBA #43589
10728 16th Ave SW
Seattle, WA 98146

**DOCUMENT TITLE:** NOTICE OF LIS PENDENS (Notice of Pendency of Action)

**GRANTOR(S) / PARTIES AGAINST WHOM NOTICE IS GIVEN:** LOZANO KENNEDY, ALEXANDRA; LOZANO PEREA, MAGALY. Additional parties on page 2.

**GRANTEE(S) / PARTIES GIVING NOTICE:** MEJIA SANCHEZ, ERIKA ALEJANDRA. Additional parties on page 2.

**ABBREVIATED LEGAL DESCRIPTION: FOREST CREST ESTATES PLAT BLOCK: PLAT LOT: 12, COUNTY OF KING, STATE OF WASHINGTON**

*Full legal description set forth in Section 4 below.*

**ASSESSOR'S TAX PARCEL / ACCOUNT NO.: 2591780120**

---

## NOTICE OF LIS PENDENS

NOTICE IS HEREBY GIVEN, pursuant to RCW 4.28.320 and RCW 4.28.325 and 28 U.S.C. § 1964, that the action described below has been commenced and is now pending in the United States District Court for the Western District of Washington at Seattle, and that the action affects the title to the real property situated in King County, Washington that is described in Section 4 below.

**1. The Action.**

**Court:** United States District Court for the Western District of Washington at Seattle
**Cause No.:** 2:26-cv-01587-RSM

**Date action commenced:** May 11, 2026
**Operative pleading:** First Amended Complaint, ECF No. 11, filed July 21, 2026

2. **The Parties.**

**Plaintiffs:** Erika Alejandra Mejia Sanchez, etc. *et.al.;*

**Defendants:** Alexandra Lozano Kennedy, an individual; Magaly Lozano Perea, an individual, etc., et.al.

Record title to the real property described in Section 4 is held by Defendants Alexandra Lozano Kennedy and Magaly Lozano Perea, each of whom is a party to the action.

3. **Object of the Action.**

Plaintiffs seek an imposition of a constructive trust in favor of Plaintiffs upon real property acquired with, or traceable to, funds paid by Plaintiffs to Defendants, including the real property described in Section 4 below, and upon the proceeds of any sale, transfer, or other disposition of that property;

The action affects the title to the real property described in Section 4 below.

4. **Description of the Real Property Affected.**

The real property affected by the action is situated in King County, Washington, and is described as follows:

**Street address: 20511 SE 261t Place, Covington, WA 98042**
**Assessor's Tax Parcel / Account No.: 2591780120**

**Legal description: Lot 12, FOREST CREST ESTATES, according to the plat thereof recorded in Volume 213 of Plats, pages 61 and 62, records of King County, Washington.**

5. **Effect of This Notice.**

From the time of the filing of this Notice for record with the King County Recorder, a purchaser or encumbrancer of the real property described in Section 4, or of any part of it, shall be deemed to have constructive notice of the pendency of the action and shall be bound by all proceedings taken after the filing of this Notice to the same extent as if that purchaser or encumbrancer were a party to the action.

DATED this 22 day of July, 2026.

**BARRAZA LAW, PLLC**

Vicente Omar Barraza, WSBA #43589
10728 16th Ave SW
Seattle, WA 98146
206-933-7861 Office
omar@barrazalaw.com

*Attorneys for Plaintiffs*

**Return Address:**
Vicente Omar Barraza
10728 16th Ave SW
Seattle, WA 98146

20260723000028
LIS PENDENS Rec: $306.50
7/23/2026 8:44 AM
KING COUNTY, WA

Please print or type information **WASHINGTON STATE RECORDER'S Cover Sheet** (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)

1. Notice of Lis Pendens 2. ______
3. ______ 4. ______

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page ______ of document

**Grantor(s)** Exactly as name(s) appear on document

1. Five Star Legacy Trust, ______
2. Lozano Kennedy, Alexandra, ______

Additional names on page ______ of document.

**Grantee(s)** Exactly as name(s) appear on document

1. Mejia Sanchez, Erika Alejandra, etc. et.al., ______
2. ______, ______

Additional names on page ______ of document.

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)

UNIT 3504, THE EMERALD, VOL. 315, P.11-61, COUNTY OF KING, STATE OF WASHINGTON

Additional legal is on page _____ of document.

**Assessor's Property Tax Parcel/Account Number** ☐ Assessor Tax # not yet assigned

232971251003

The Auditor/Recorder will rely on the information provided on this form. The staff will not read the document to verify the accuracy or completeness of the indexing information provided herein.

**"I am signing below and paying an additional $50 recording fee (as provided in RCW 36.18.010 and referred to as an emergency nonstandard document), because this document does not meet margin and formatting requirements. Furthermore, I hereby understand that the recording process may cover up or otherwise obscure some part of the text of the original document as a result of this request."**

______ Signature of Requesting Party

**Note to submitter: Do not sign above nor pay additional $50 fee if the document meets margin/formatting requirements**

AFTER RECORDING RETURN TO:
Vicente Omar Barraza
10728 16th Ave SW
Seattle, WA 98146

**DOCUMENT TITLE:** NOTICE OF LIS PENDENS (Notice of Pendency of Action)

**GRANTOR(S) / PARTIES AGAINST WHOM NOTICE IS GIVEN: FIVE STAR LEGACY TRUST;** LOZANO KENNEDY, ALEXANDRA; LOZANO PEREA, MAGALY. Additional parties on page 2.

**GRANTEE(S) / PARTIES GIVING NOTICE:** MEJIA SANCHEZ, ERIKA ALEJANDRA, etc., et.al. Additional parties on page 2.

**ABBREVIATED LEGAL DESCRIPTION: UNIT 3504, THE EMERALD, VOL. 315, P.11-61, COUNTY OF KING, STATE OF WASHINGTON**

*Full legal description set forth in Section 4 below.*

**ASSESSOR'S TAX PARCEL / ACCOUNT NO.: 232971251003**

---

## NOTICE OF LIS PENDENS

NOTICE IS HEREBY GIVEN, pursuant to RCW 4.28.320 and RCW 4.28.325 and 28 U.S.C. § 1964, that the action described below has been commenced and is now pending in the United States District Court for the Western District of Washington at Seattle, and that the action affects the title to the real property situated in King County, Washington that is described in Section 4 below.

1. **The Action.**

   **Court:** United States District Court for the Western District of Washington at Seattle
   **Cause No.:** 2:26-cv-01587-RSM
   **Date action commenced:** May 11, 2026
   **Operative pleading:** First Amended Complaint, ECF No. 11, filed July 21, 2026

2. **The Parties.**

   **Plaintiffs:** Erika Alejandra Mejia Sanchez, etc. *et.al.;*

   **Defendants:** Alexandra Lozano Kennedy, an individual; Five Star Legacy Trust, a Washington trust; etc., et.al.

   Record title to the real property described in Section 4 is held by Defendants Five Star Legacy Trust and its Trustee Alexandra Lozano, each of whom is a party to the action.

3. **Object of the Action.**

   Plaintiffs seek an imposition of a constructive trust in favor of Plaintiffs upon real property acquired with, or traceable to, funds paid by Plaintiffs to Defendants, including the real property described in Section 4 below, and upon the proceeds of any sale, transfer, or other disposition of that property;

   The action affects the title to the real property described in Section 4 below.

4. **Description of the Real Property Affected.**

   The real property affected by the action is situated in King County, Washington, and is described as follows:

   **Street address: 121 Stewart St., #3504, Seattle, WA 98101**
   **Assessor's Tax Parcel / Account No.: 2329712510**

   **Legal description:** UNIT 3504, THE EMERALD, A CONDOMINIUM, ACCORDING TO DECLARATION THEREOF RECORDED UNDER KING COUNTY RECORDING NO. 20201208002087, AND ANY AMENDMENTS THERETO; SAID UNIT IS LOCATED ON SURVEY MAP AND PLANS FILED IN VOLUME 315 OF CONDOMINIUMS, PAGE(S) 11 THROUGH 61, IN KING COUNTY, WASHINGTON.

5. **Effect of This Notice.**

   From the time of the filing of this Notice for record with the King County Recorder, a purchaser or encumbrancer of the real property described in Section 4, or of any part of it, shall be deemed to have constructive notice of the pendency of the action and shall be bound by all proceedings taken after the filing of this Notice to the same extent as if that purchaser or encumbrancer were a party to the action.

DATED this 22 day of July, 2026.

**BARRAZA LAW, PLLC**

Vicente Omar Barraza, WSBA #43589
10728 16th Ave SW
Seattle, WA 98146
206-933-7861 Office
*omar@barrazalaw.com*

*Attorneys for Plaintiffs*

# EXHIBIT 21

THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON – AT SEATTLE

| | |
|---|---|
| ERIKA ALEJANDRA MEJIA SANCHEZ, an individual; JUAN MANUEL VILLANUEVA VEGA, an individual; SEVERO LOPEZ CONTRERAS, an individual; NORA PATRICIA MURILLO MORENO, an individual; ANGÉLICA MARIA BARAJAS HORTA, an individual; ANA MARIA GARCIA MARTINEZ, an individual; GABRIEL MARTINEZ GARCIA, an individual; GERARDO PRADO RIVERA, an individual; AURORA LIZZETTE LEAL RUBIO, an individual; JOSE ENRIQUE VILLALON RIVERA, an individual; CARLOS ENRIQUE NAVARRO CEJA, an individual; MARIA GUADALUPE FERNANDEZ RAYAS, an individual; JOAQUIN COTO ROMAN, an individual; SAMANTA SINAI MARIN SOSA, an individual; MIGUEL GALVAN RODRIGUEZ, an individual; VERONICA FLORES CAMPOS, an individual; JOSE MARGARITO MURATALLA MAGANA, an individual; CLAUDIA GALINDO VELASQUEZ, an individual; ROSAURA GALLARDO MARTINEZ, an individual; WILSON ERENDIRA NAVA, an individual; PEDRO ALBERTO GARCIA VIDACA, an individual; JOSE LUIS ORTIZ OSORIO, an individual; ISIDRO MENDOZA JIMENEZ, an individual; ANGELICA ISABEL SOLIS ROMERO, an individual; JOSE VASQUEZ ROCETE, an individual; MARTIN | No. 2:26-cv-01587-RSM<br><br>DEFENDANTS ALEXANDRA LOZANO KENNEDY, LA LUZ LEGAL DEL CAMINO LEGAL, PLLC F/K/A ALEXANDRA LOZANO IMMIGRATION LAW, PLLC, SALUD TOTAL, LLC, AMIGA LAWYERS, LLC, AND ALLY LOZANO, LLC'S INITIAL DISCLOSURES |



ANGELI & CALFO LLC
ATTORNEYS AT LAW
701 Pike Street, Suite 1625
Seattle, WA 98101
Tel: 206-703-4810

GONZALEZ GARIBAY, an individual; MARTHA ELIZABETH CHAVEZ GOMEZ, an individual; DIANA YAZMIN BARAJAS HORTA, an individual; IDALIA GUZMAN VIDALS, an individual; RICARDO REYNOSO JAIMES, an individual; ANA LETICIA RANGEL SALINAS, an individual; MA PABLA PRIETO MUNIZ, an individual; JOSE JESUS MEDINA JUAREZ, an individual; and FABIOLA SOSA RODRIGUEZ, an individual,

Plaintiffs,

vs.

ALEXANDRA LOZANO KENNEDY, an individual; MAGALY LOZANO PEREA, an individual; LA LUZ DEL CAMINO LEGAL, PLLC, f/k/a ALEXANDRA LOZANO IMMIGRATION LAW PLLC, a Washington professional limited liability company; EN SOLIDARIDAD, LLC, a Washington limited liability company; SALUD TOTAL, LLC, a Wyoming limited liability company; AMIGA LAWYERS LLC, a Washington limited liability company; ALLY LOZANO, LLC, a Washington limited liability company; SUENO CUMPLIDO, LLC, a Washington limited liability company; 5 BRANCHES HOLDING COMPANY, LLC, a Washington limited liability company; FIVE STAR LEGACY TRUST, a Washington trust; DOE INDIVIDUALS 1-10; and, DOE ENTITIES 1-10,

Defendants.

Defendants Alexandra Lozano Kennedy, La Luz Legal Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, PLLC, Salud Total, LLC, Amiga Lawyers, LLC, and Ally Lozano, LLC submit the following Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure. These disclosures are based upon information currently known, and the above-referenced Defendants reserve the right to supplement or revise these disclosures as appropriate. By making these disclosures, the above-referenced Defendants do not waive, but expressly reserve, all applicable privileges and protections, as well as its right



ANGELI & CALFO LLC
ATTORNEYS AT LAW
701 Pike Street, Suite 1625
Seattle, WA 98101
Tel: 206-703-4810

to object to any discovery and to object on any grounds to the use of any document or information identified herein.

**<u>Individuals Likely to Have Discoverable Information that the Above-referenced Defendants May Use to Support their Claims or Defenses</u>**

1. Each of the Named Plaintiffs. Subjects that may be addressed include: (1) Plaintiffs' claims, the allegations of their Complaint, and any injuries or damages (or lack thereof); (2) Plaintiffs' engagement of, interactions with, and services performed by Defendants Alexandra Lozano Kennedy and La Luz Del Camino Legal f/k/a Alexandra Lozano Immigration Law; (3) Plaintiffs' engagement of, interactions with, and services performed by Defendants En Solidaridad, LLC and Salud Total, LLC; and (4) immigration benefits secured by Plaintiffs with the assistance of Alexandra Lozano Kennedy and La Luz Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, PLLC.

2. Individuals identified in Plaintiffs' client files as presently maintained by Defendant La Luz Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, LLC who worked on Plaintiffs' immigration cases or supported/supplemented Defendant La Luz Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, LLC's work on Plaintiffs' immigration cases. Subjects that may be addressed include: (1) Plaintiffs' engagement of, interactions with and services performed by Defendant La Luz Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, LLC; (2) Plaintiffs' engagement of and interactions with Defendant En Solidaridad, LLC and Defendant Salud Total, LLC; and (3) immigration benefits secured by Plaintiffs with the assistance of Defendant La Luz Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, LLC.

3. One or more currently unidentified former officers and/or employees of La Luz Legal Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, PLLC. Subjects within their scope of knowledge include: (1) processes followed to gather client information and determine client immigration strategy; (2) workflow processes utilized to prepare and



ANGELI & CALFO LLC
ATTORNEYS AT LAW
701 Pike Street, Suite 1625
Seattle, WA 98101
Tel: 206-703-4810

finalize client submissions to USCIS; (3) post-USCIS submission services provided to clients; (4) USCIS practices regarding processing of client applications, and (5) other relevant practices and policies.

4. Alexandra Lozano, c/o Angeli Calfo LLC. Ms. Lozano has information related to the operations and business practices of La Luz Legal Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, PLLC.

5. One or more currently unidentified officers of the United States Customs and Immigration Service ("USCIS"). Subjects within their scope of knowledge include USCIS' current and historical practices and policies regarding the processing, approval, and denial of applications for immigration relief, including applications made on Forms I-360 and I-485.

6. Expert witnesses designated by any party.

7. Any witness necessary to lay a foundation for any document.

8. All witnesses identified by Plaintiffs in their Initial Disclosures.

9. Any witness that becomes known during the course of discovery or who is identified in Plaintiffs' or any of Defendants' discovery responses or document productions.

**Documents the Above-referenced Defendants May Use to Support its Claims or Defenses**

1. Documents present in Plaintiffs' client files as presently maintained by La Luz Legal Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, PLLC and /or Salud Total, LLC.

2. Documents setting forth or reflecting the policies and practices of La Luz Legal Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, PLLC.

3. All documents referenced in Plaintiffs' Complaint.

4. Any and all documents produced by Plaintiffs or any other party or non-party pursuant to discovery and/or subpoena.

5. Any and all deposition transcripts and deposition exhibits.

6. Any and all documents relied upon by Plaintiffs in this action.



ANGELI & CALFO LLC
ATTORNEYS AT LAW
701 Pike Street, Suite 1625
Seattle, WA 98101
Tel: 206-703-4810

7. Any and all rebuttal or impeachment documents as may be deemed necessary.

8. Any and all documents that may become known during the course of discovery.

**Damages**

The above-referenced Defendants reserve the right to seek attorneys' fees and costs to the extent permitted by law.

**Insurance (Fed. R. Civ. P. 26(a)(1)(A)(iv)**

See Attachment 1.

Dated this 21st day of July 2026.

ANGELI & CALFO LLC

By: */s/ Harold Malkin*
Angelo J. Calfo, WSBA #27079
Peter D. Hawkes, WSBA #56794
Harold Malkin, WSBA #30986
Tyler S. Weaver, WSBA #29413
701 Pike Street, Suite 1625
Seattle, WA 98101
Tel: 206-703-4810
angelo@angelicalfo.com
peter@angelicalfo.com
harold@angelicalfo.com
tylerw@angelicalfo.com

*Attorneys for Defendants Alexandra Lozano Kennedy, La Luz Legal Del Camino Legal, PLLC f/k/a Alexandra Lozano Immigration Law, PLLC, Salud Total, LLC, Amiga Lawyers, LLC, and Ally Lozano, LLC*

## CERTIFICATE OF SERVICE

The undersigned declares under penalty of perjury, under the laws of the State of Washington, that the following is true and correct:

That on the 21st day of July 2026, I arranged for service of the foregoing **DEFENDANTS ALEXANDRA LOZANO KENNEDY, LA LUZ LEGAL DEL CAMINO LEGAL, PLLC F/K/A ALEXANDRA LOZANO IMMIGRATION LAW, PLLC, SALUD TOTAL, LLC, AMIGA LAWYERS, LLC, AND ALLY LOZANO, LLC'S INITIAL DISCLOSURES** via Email to the parties to this action as follows:

Tallman H. Trask, WSBA #60280
Aric S. Bomsztyk, WSBA #38020
Blair M. Russ, WSBA #40374
TOMLINSON BOMSZTYK RUSS
1000 Second Avenue, Suite 3600
Seattle, WA 98104
Tel: 206-621-1871
bmr@tbr-law.com
tht@tbr-law.com
asb@tbr-law.com

***Attorneys for Plaintiffs***

Vicente Omar Barraza, WSBA #43589
BARRAZA LAW, PLLC
10728 16th Avenue SW
Seattle, WA 98146
Tel: 206-933-7861
omar@barrazalaw.com

***Attorneys for Plaintiffs***

Feve R. Retonio

Feve R. Retonio, Legal Assistant



ANGELI & CALFO LLC
ATTORNEYS AT LAW
701 Pike Street, Suite 1625
Seattle, WA 98101
Tel: 206-703-4810

# Golden Bear Insurance Company

## Lawyers Professional Liability
## Declarations

**Policy Number** GAL03000770-02

| **Named Insured and Mailing Address** | **Producer** |
|---|---|
| Alexandra Lozano Immigration Law, PLLC | Acrirange, LLC dba Founders Professional |
| 6720 Fort Dent Way, Suite 230 | 2038 1st Ave South |
| Tukwila, WA 98188 | Saint Petersburg, FL 33712 |

**Policy Period** from **October 26, 2025** to **October 26, 2026** - 12:01 A.M. Standard Time at the mailing address

**CLAIMS** MADE WARNING TO POLICYHOLDER: This Policy provides coverage on a **Claims** Made and Reported basis subject to its terms. Payments made by the **Company** for **Loss** and **Claims Expenses** will reduce the Limit of Liability.

PLEASE READ THE ENTIRE POLICY CAREFULLY. Words or phrases appearing in this Policy in **bold** have special meaning as stated in Section **IX. DEFINITIONS.** These definitions apply to the entire Policy, including all endorsements.

In consideration for the **Insured's** payment of the Premium and the **Deductible** or **Self-Insured Retention** amount stated in the Declarations and subject to all the terms and conditions herein, Golden Bear Insurance Company agrees with the **Insured** to provide the insurance described in this Policy as follows:

| **Limit of Liability** | |
|---|---|
| **Each Claim Limit** (All **Loss** and **Claims Expenses** from All **Claims**) | $1,000,000 |
| **Aggregate Policy Limit** (All **Loss** and **Claims Expenses** from All **Claims**) | $2,000,000 |

| **Enrichment Coverages** | |
|---|---|
| **Appearance Pay Aggregate Limit** (Subject to a $500 day limit) | $10,000 |
| **Disciplinary Proceeding Expense** (Total Aggregate) | $25,000 |
| **Subpoena Assistance Aggregate Limit** (This is within the Aggregate Policy Limit) | $5,000 |
| **Crisis Management Aggregate Limit** (This is within the Aggregate Policy Limit) | $25,000 |

| | |
|---|---|
| **Deductible** | $100,000 |
| **Aggregate Deductible** | N/A |
| **Self Insured Retention** | N/A |
| **Annual Premium** | $66,400 |

**Retroactive Date: - Please See Endorsement GB-PLL492 (04 19) Split Retroactive Date Endorsement**

**Forms and endorsement attached at inception and included in this policy are listed on the Schedule of Forms and Endorsements, GB-PLL101 (01 17).**

Broker Fee:
$350.00
Surplus Lines Tax (2%)
$1,335.00
Stamping Fee (0.3%):
$200.25